[No. B116141. Second Dist., Div. Three. June 9, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
ALTON CHARLES ALLEN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, it is ordered that the opinion be partially published and the following portions be deleted from the published version: parts 2 and 3 of Discussion.

COUNSEL

Bruce Daniel Rosen, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Sanjay T. Kumar, Alene M. Games and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KLEIN, P. J.**—Defendant and appellant, Alton Charles Allen, appeals from the judgment entered following his conviction, by jury trial, for special

circumstances murder (during the commission of a burglary) and forcible rape, with a dangerous weapon use finding (Pen. Code, §§ 187, 190.2, subd. (a)(17)(G), 261, 12022, subd. (b)).[1] Sentenced to a state prison term of life without the possibility of parole, he contends the trial court erred by admitting certain DNA evidence.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established the following.

1. *Prosecution evidence.*

Phyllis H. (Phyllis) and 81-year-old Emery H. (Emery) were involved in an intimate relationship and periodically lived together at Emery's house. Phyllis called Emery "Uncle Red." The back porch of the house was enclosed and had been turned into a laundry room.

On October 2, 1994, between 7:30 and 8:00 p.m., Emery and Phyllis were asleep when Phyllis was awakened by a rumbling in the bed. She awoke to find an intruder, whom she described as a thin Black man wearing a mask, struggling with Emery at the foot of the bed. The intruder was stabbing Emery with a knife. Phyllis screamed, "Don't hurt him. He doesn't have any money." The intruder said, "My friend told me he had some money, and that's why I'm here." The intruder asked Phyllis where the money and where the keys to the closet were located; he also asked where the gun was. Phyllis said she didn't know, although she was aware the intruder was talking about the keys to a closet where Emery kept his money and his gun.

During the struggle, the intruder beat, kicked and stabbed Emery. The intruder then tried to kick in a closet door and he ransacked the bedroom. The intruder said to Emery, "Give me the money you old mother fucker." Emery, who was lying on the floor, kept repeating, "Oh, Vergie." The intruder took a dollar and change from Emery's pants pocket.

The intruder sexually assaulted Phyllis, forcing her to orally copulate him and then raping her. Ultimately, the intruder fled.

Raul Morales, Emery's next-door neighbor, answered a banging on his front door and found Phyllis screaming hysterically. Morales went next door

---

[1]All further statutory references are to the Penal Code unless otherwise specified.

and found Emery moaning in a pool of blood. Morales asked Emery several times who had done this, and Emery responded by saying "Virge," "Vergie" or "Virginia."

Emery had been stabbed seven times; one of three stab wounds to his back proved to be fatal and he died later that night.

When officers arrived, they noticed the window in the rear laundry room was open and that the window screen had been cut recently. There were fingerprints visible in a thin layer of dust on top of the washing machine. There was a chair beneath the rear window leading to the laundry room and there was a shoe print on the chair. It appeared this window had been the intruder's point of entry.

Deputy Larry Mitchell, a crime scene investigator, went to examine the laundry room window. There was a washing machine below the window. Mitchell noticed the window screen had been cut from the outside and that the window had been pried open. He saw a handprint in the dust on top of the washing machine. Mitchell testified the handprint could not have been there very long, because otherwise it would have been absorbed by the dust. Mitchell was able to lift two fingerprints from the handprint. They matched defendant Allen's fingerprints.

Based on the fingerprint match, an arrest warrant was issued and Allen was apprehended. Informed he was being arrested for murder, Allen asked Detective Reed who had been killed and where it had happened. Reed told Allen the victim's name was Emery and that it had happened on Marymonte. Allen said "that he didn't know the victim and he had never been on that street before."

Heidi Robbins, a supervising criminalist in the serology department[2] of the Los Angeles County Sheriff's Department Crime Laboratory, tested blood and semen stains from the crime scene. She concluded a semen stain on Phyllis's pants could not have been produced by Emery, but was consistent with someone having the same genetic markers as Allen—blood type O, PGM subtype 2+1+, and a secretor status. About 8 percent of the population has this combination of markers.

Paul Colman, a senior criminalist for the Los Angeles County Sheriff's Department Crime Laboratory, did a DNA analysis on the semen stain. He typed six genetic loci by the restriction fragment length polymorphism

[2]Serology involves the testing of bodily fluids for such factors as ABO blood type and PGM (an enzyme) type.

(RFLP) testing process and found that two of these loci matched Allen's DNA sample. Colman concluded the DNA from the semen stain could have come from Allen, and calculated that the odds of a randomly selected African-American having the same two loci combination would be 6,200 to 1.

Dr. Charlotte Word is a microbiologist and deputy director of Cellmark Labs. In August 1995, Cellmark was asked by the Los Angeles Sheriff's Department to conduct further DNA testing on the semen stain. Cellmark performed polymerase chain reaction (PCR) testing, a method used when there is only a limited supply of DNA available for testing. Cellmark used three different kinds of PCR testing: DQ-Alpha (which tests a single genetic marker), Polymarker (which tests five genetic markers), and short tandem repeats or STR's (which test three genetic markers). The testing included a total of nine genetic markers when the results of all three tests were combined. Dr. Word put the random match probability as determined by the DQ-Alpha/Polymarker testing at 1 in 1,700 African-Americans. She concluded from this that Allen could not be excluded as the source of the semen. Word testified the STR results had not excluded Allen as a source of the semen. Finally, based on a combination of the serology results (which are another way of testing genetic markers), Colman's DNA tests and Cellmark's DNA tests, Word testified she had concluded that "within a reasonable degree of scientific certainty" Allen was the source of the semen stain.

### 2. *Defense evidence.*

Allen testified he had met Emery at Gilbert Davis's house not long before Emery was murdered. Davis lived with his mother, Virginia Davis. Allen and Gilbert had been friends for four or five years.

Allen was selling crack cocaine, and Phyllis occasionally bought from him. One day Phyllis offered Allen sex in exchange for crack and he took her up on it. About two or three weeks before the murder, Allen went to Emery's house to make a drug delivery to Phyllis. When he arrived, Phyllis said she wanted $15 worth of rock cocaine. She took Allen to the laundry room, where he cut a piece of cocaine on the top of the washing machine. Allen left after five minutes.

On a second visit, Allen went to Emery's house to pick up money for drugs he had sold to Phyllis on credit. Both Emery and Phyllis were home at the time.

Then, about a week before Emery's murder, Allen bought a $50 piece of crack cocaine and Phyllis wanted some. When Allen said he still had to cut

it up, Phyllis told him to come over to the house and cut it up there. When Allen arrived, Phyllis led him to the laundry room and gave him a razor.

On the day of the murder, Allen and Gilbert Davis went to a party in the afternoon. Allen left about 6:00 p.m. He took a bus to his father's apartment, where he was living at the time, and arrived there about 7:00 p.m. His father let him into the building and Allen did not leave the apartment that night.

When he was arrested and the detectives told him Emery was the victim, Allen didn't recognized the name because he knew Emery as "Red." Allen told them he had never been on Marymonte because he didn't want to have anything to do with a murder.

Called as a defense witness, Phyllis testified October 2, 1994, was a hot day and that on hot days the window on the back porch was left open.

Marc Taylor, the defense DNA expert, testified about the DQ-Alpha, Polymarker and STR testing done by Cellmark. Taylor concluded that although Allen might have been the source of the semen, he could not say Allen was the source.

## DISCUSSION

Allen contends the trial court erred by finding that STR testing is generally accepted in the scientific community, and by admitting STR testing results while excluding the corresponding statistical probability evidence. He contends the erroneous admission of the STR test results was prejudicial because this was the only evidence identifying him as the perpetrator. His claims are meritless.

■ "[E]vidence based on a new scientific method of proof is admissible only on a showing that the procedure has been generally accepted as reliable in the scientific community in which it developed. [Citations.]" (*People v. McDonald* (1984) 37 Cal.3d 351, 372 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) The *Kelly*[3] test for new scientific methods requires the proponent of the evidence to establish that: (1) the technique has gained

---

[3]*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]. Originally known as the *Kelly/Frye* test (*Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145]), *Frye* was rejected as a federal rule of evidence in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [113 S.Ct. 2786, 125 L.Ed.2d 469]. The *Kelly* rule was reaffirmed in *People* v. *Leahy* (1994) 8 Cal.4th 587 [34 Cal.Rptr.2d 663, 882 P.2d 321]. *Kelly* itself said: "[A]dmissibility of expert testimony based upon the application of a new scientific technique traditionally involves a two-step process: (1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such

general acceptance in its field; (2) the testimony regarding the technique and its application is offered by a properly qualified expert; and (3) correct scientific procedures were used in this particular case. (*People* v. *Morris* (1991) 53 Cal.3d 152, 206 [279 Cal.Rptr. 720, 807 P.2d 949], disapproved on other grounds in *People* v. *Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].)

1. *General acceptance in the scientific community.*

■ Allen argues the STR testing evidence should have been completely excluded because it has not been shown to satisfy the *Kelly* test.[4] He complains the only evidence regarding general scientific acceptance consisted of the testimony from a Cellmark employee. We fail to see why that was not competent evidence of general acceptance in the scientific community. (See *State* v. *Jackson* (1998) 255 Neb. 68 [582 N.W.2d 317, 325] [director of lab that did DNA testing by PCR STR method testifies regarding acceptance in scientific community].)

Allen complains that "not one published decision mentions or discusses STR testing." However, although there are no published California decisions discussing STR testing, two out-of-state cases have approved STR testing. "[O]nce a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*People* v. *Kelly, supra,* 17 Cal.3d at p. 32.) There is no reason why only California cases suffice for this purpose. "[B]ecause appellate endorsement of a technique ends the need for case-by-case adjudication [citation], this court has sometimes looked beyond the trial record, examining California precedent, cases from other jurisdictions, and the scientific literature itself, to ascertain whether a particular technique is generally accepted." (*People* v. *Brown* (1985) 40 Cal.3d 512, 530 [230 Cal.Rptr. 834, 726 P.2d 516]; see *People* v. *Morganti, supra,* 43 Cal.App.4th at p. 666 [pointing out that although PCR evidence had not been found admissible in any published California case, "courts in other jurisdictions have concluded that PCR analysis of DQ alpha is generally accepted as reliable in the scientific community"].)

In *Com.* v. *Rosier* (1997) 425 Mass. 80 [685 N.E.2d 739], the Supreme Court of Massachusetts affirmed a trial court's finding that STR testing is

testimony must be properly *qualified as an expert to give an opinion* on the subject. [Citation.] Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case." (*Kelly, supra,* at p. 30.)

[4]Allen concedes the RFLP and DQ-Alpha PCR testing evidence was properly admitted because these tests have been judicially approved. (See *People* v. *Morganti* (1996) 43 Cal.App.4th 643, 666 [50 Cal.Rptr.2d 837].)

scientifically reliable. "The defendant's appellate counsel appears to suggest that STR testing is unreliable because it is too new. No specific scientific or forensic evidence or literature is offered to support that suggestion. The judge heard testimony that, in 1991, several years before the STR kit became commercially available, Cellmark, working under contract to the United States government, used STR testing to identify the remains of soldiers killed in Operation Desert Storm, and that, by the time of the hearing, Cellmark had performed STR analysis in approximately fifty cases and had been permitted to testify as to its test results in at least five cases. While we have not been directed to any decisional law approving STR testing, an authoritative scientific study, the 1996 report of the National Research Council entitled, The Evaluation of Forensic DNA Evidence (1996 NRC Report), has concluded (*id.* at 71) that STR testing is 'coming into wide use,' that 'STR loci appear to be particularly appropriate for forensic use' (*id.* at 117), and that 'STRs can take their place along with VNTRs as forensic tools' (*id.* at 35). The latter comment appears to recognize that STR testing is similar in principle to the RFLP (or VNTR) method, which has been found to be reliable. [Citation.] Based on the evidence before him and his careful analysis of the subject, the judge properly concluded that the methodology underlying the PCR-based tests in this case, including the STR testing, was scientifically valid and relevant to a fact at trial. [Citation.]" (*Com.* v. *Rosier, supra,* 685 N.E.2d at p. 743, fns. omitted.)

Then in *State* v. *Jackson, supra,* 582 N.W.2d 317, the Supreme Court of Nebraska affirmed a trial court's finding that the prosecution had shown STR testing was generally accepted by the relevant scientific community. The court noted a director of the University of Nebraska Medical Center laboratory had testified PCR STR testing was generally accepted in the scientific community, that this method has "been around several years now, and there is nothing unique about PCR STR versus any PCR." (*Id.* at p. 325.) The court held: "Based on this evidence, we can only conclude that the trial court was correct in determining that the PCR STR DNA test used in the instant case was generally accepted within the scientific community." (*Ibid.*)

Allen also complains there is no evidence STR testing had been validated by the time it was utilized in this case, arguing: "The question here is not whether STR testing has gained acceptance in the scientific community since appellant's trial. Rather, it is whether at that time it was generally accepted and appropriately validated such that the results admitted to convict appellant should have been admitted." Allen cites no authority or reasoned argument in support of this assertion and we disagree with it. The issue is not *when* a new scientific technique is validated, but *whether* it is or is not valid; that is why the results generated by a scientific test once considered

valid can be challenged by evidence the test has since been invalidated. (See *People* v. *Smith* (1989) 215 Cal.App.3d 19, 25 [263 Cal.Rptr. 678] [in determining whether particular technique is generally accepted "defendant is not foreclosed from showing new information which may question the continuing reliability of the test in question or to show a change in the consensus within the scientific community concerning the scientific technique"].)

2., 3.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## DISPOSITION

The judgment is affirmed.

Kitching, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 22, 1999.

---

*See footnote, *ante*, page 1093.