[No. B143524. Second Dist., Div. Six. May 16, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
JONATHAN LAMONTE HILL, Defendant and Appellant.

## COUNSEL

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Scott A. Taryle and Richard T. Breen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**YEGAN, J.**—Ten years ago in *People v. Axell* (1991) 235 Cal.App.3d 836 [1 Cal.Rptr.2d 411], in an opinion authored by Presiding Justice Stone, we were the first California appellate court to approve the use of deoxyribonucleic acid (DNA) typing evidence to prove identity in a criminal case. Since then, the scientific methodology, while fundamentally the same, has become more refined and sophisticated. As of 1999, the "state of the art" was the Profiler Plus DNA test kit which here was used to prove identity. As we shall explain, this specific test kit does not embrace any new scientific technique requiring a first prong *Kelly* hearing. (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240].)

Jonathan Lamonte Hill appeals from the judgment after a jury convicted him of residential burglary (count 1; Pen. Code, § 459),[1] rape (count 2; § 261, subd. (a)(2), forcible oral copulation (count 3; § 288a, subd. (c)(2)), forcible sodomy (count 4; § 286, subd. (a)), and anal and genital penetration by a foreign object (count 5; § 289, subd. (a)(1)). The jury found that he used a deadly weapon, a knife, in the commission of counts 2 through 5 (§ 12022.3, subd. (a)) and that the sex offenses were committed during the burglary (§ 667.61, subd. (a)). The trial court imposed a sentence of 49 years to life.[2]

Appellant contends that the trial court erred in denying his motion to suppress evidence and in denying his request for a "full *Kelly/Frye*" hearing (*People v. Kelly*, *supra*, 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 292 Fed. 1013) to determine the scientific reliability of the Profiler Plus DNA test kit. We affirm.

---

[1] All statutory references are to the Penal Code.

[2] Counts 1 through 5 pertain to the August 17, 1999 counts. Appellant was acquitted of counts 6 through 8 which pertain to the events of August 29, 1999. We discuss these latter counts because they have relevance to appellant's claim that he was unlawfully arrested.

*Facts*

On August 17, 1999, Melissa K. woke up in her Del Playa Isla Vista bedroom and saw a man, later identified through DNA analysis as appellant, sitting on her bed. It was 3:00 a.m. Appellant held a kitchen knife to her throat and said "Shut up. Don't say a word. Don't move. Don't scream." Melissa K. was ordered to roll over onto her stomach. Appellant pulled down her shorts, orally copulated her, digitally penetrated her vagina, raped and sodomized her.

Appellant smelled of cigarette smoke and wore a chain-like necklace with a medallion or pendant. Before leaving, he rummaged through the bedroom. Appellant took her cordless phone, her watch, and money.

Melissa K. saw appellant's profile but not his face. She described him as follows: African-American, early 20's, about 5 feet 10 inches tall, lean and muscular, 160 to 170 pounds, a shaved head, and a deep or mellow voice. Melissa K. underwent a sexual assault medical exam. Vaginal and anal swabs were taken for DNA testing.

Twelve days later on August 29, 1999, another sexual assault occurred on Del Playa, two buildings away from Melissa K.'s apartment. Medea D. woke up at 6:00 a.m. and was assaulted by an African-American male in his early 20's. The man held a knife to her forehead and said, "Turn over, don't scream, and don't look at my face." Medea D. shared the bedroom with Angela A. When Angela A. woke up, she was also assaulted with the knife and ordered to lie facedown. Angela A. bit the intruder's thumb and hit him with a clothes iron as he ran from the apartment.

Six Isla Vista residents told the police that a man who called himself John Beauregard fit the assailant's description and drove a four-door black Honda Accord. Kelly N. and John went to a party at Melissa K.'s apartment three days before the August 17, 1999 rape. At that time, John gave Kelly N. his pager number. John said that he went to University of California at Los Angeles and played football. He bragged about his sexual aggressiveness. At trial, Kelly N. identified appellant as the man who said he was John Beauregard. Stephanie J. lived on Sabado Tarde, less than two blocks from Mellisa K.'s and Medea D.'s apartments. She told the police that John left her apartment shortly after 2:00 a.m. on August 17, wearing a gold chain and a medallion.

The police hired a private investigator to trace John's pager number by calling the pager and leaving an 800 number. When John called back, the call was traced to an apartment on the east side of Ventura.

On September 2, 1999, the police conducted a surveilance of appellant's apartment. The officers saw that he matched the description of the suspect in both sexual assaults. Appellant drove away in a four-door black Honda Accord, this car matched the description of the vehicle driven by the man who called himself John Beauregard.

Appellant drove to a pay phone. Detective Jerry Cornell detained him. Appellant was wearing a gold-colored necklace and a medallion. Appellant falsely claimed that he did not have a driver's license or any other identification. During the detention appellant's pager went off and displayed the private investigator's 800 number. An identification card in appellant's wallet indicated that his name was Jonathan Lamonte Hill.

Appellant was arrested and his car was impounded. A carton of cigarettes was on the center console between the front seats. The police found a six-inch kitchen knife under the front passenger seat. It matched the description of the assailant's knife.

After appellant was transported to Santa Barbara, the victims attended a lineup but identified someone other than appellant as the assailant. Melissa K., however, could not eliminate appellant as the assailant.

The vaginal swabs taken from Melissa K. contained enough sperm for DNA analysis. A forensic lab, Forensic Analytical, conducted two DNA tests: a DQ-Alpha/Polymarker test that used six genetic markers, and a Profiler Plus test that used nine genetic markers plus a gender marker. The Profiler Plus test indicated that appellant's DNA and the sperm DNA taken from Melissa K. had a unique genetic profile occurring in only one of 5.89 trillion African-Americans. The DQ-Alpha/Polymarker test, which was based on a lesser amount and different markers, did not exclude appellant as the source of the sperm DNA. This test indicated that appellant's DNA and the sperm DNA taken from Melissa K. had a genetic profile occurring in one of 3,900 African-Americans.[3] The trial court took judicial notice that 2.2 million African-Americans lived in California in 1990.

*Suppression Motion*

Appellant contends that the trial court erred in denying his motion to suppress the knife, the necklace, and the DNA evidence. He argues that

---

[3]The DQ-Alpha/Polymarker test kit is a combination of two DNA tests. The DQ-Alpha test kit identifies one genetic marker in the immune system. The polymarker test kit looks at five other genetic markers. Because the kits use the same test methodology (polymerase chain reaction and reverse blot dot), they were combined into one forensic test kit to simultaneously type six genetic markers. (See *People v. Allen* (1999) 72 Cal.App.4th 1093, 1097 [85 Cal.Rptr.2d 655].)

the police lacked probable cause to arrest him and that the evidence seized was the fruit of an illegal arrest. (*Wong Sun v. United States* (1963) 371 U.S. 471, 484-488 [83 S.Ct. 407, 415-418, 9 L.Ed.2d 441, 453-455].)

██ On review, we defer to the trial court's factual findings where supported by substantial evidence and determine whether there was probable cause to arrest. (E.g., *People v. Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].) Probable cause to arrest "exists when the facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person arrested is guilty of a crime. [Citations.]" (*People v. Price* (1991) 1 Cal.4th 324, 410 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

██ Here there was probable cause to arrest appellant. He closely matched the detailed description of the August 17, 1999 rapist. Melissa K. said the assailant was a Black male in his 20's, 5 feet 10 inches tall, 160-170 pounds, with a trim athletic build, a shaved head, and a deep or mellow voice. Appellant also matched Medea D.'s description of her assailant although she described the suspect as somewhat heavier and taller.

Six Isla Vista residents told the police that the suspect went by the name of John and was in Isla Vista on August 17 and 28, the evenings before the crimes were committed. Johnny Medina and Jeff Evans "partied" with John on August 14-16, 1999. Medina said that he had a scar under an eye and was aggressive with women. John bragged about having sex with a woman from Isla Vista and that the woman was "afraid of him because he was so big." John said that he continued to have sexual intercourse with the woman after she told him to stop.

Stephanie J. and Lindsey M. told the police that John tried to stay at their *Sabado Tarde* apartment the evening of August 16, 1999. After John was asked to leave, he got on Stephanie J.'s bed and put his arms around her. She ordered him out and went to Medina's house for help. John left the morning of August 17 at 1:30 a.m. Melissa K. was sexually assaulted 90 minutes later, less than two blocks from Stephanie J.'s apartment.

Jeff Evans and Andrea M. reported that John was at their Sabado Tarde apartment on August 28, 1999, and that John tried to "hit on" Andrea M. When asked to leave, he grabbed her and licked her hand. John left the apartment at 1:30 a.m. on August 29. Andrea M. said that he had a gold chain around his neck and was smoking cigarettes or marijuana. Medea D. was assaulted hours later, less than two blocks away.

Appellant argues that a general description of a suspect, standing alone, is not probable cause to arrest. (*People v. Mickelson* (1963) 59 Cal.2d 448,

453-454 [30 Cal.Rptr. 18, 380 P.2d 658]; *People v. Curtis* (1969) 70 Cal.2d 347, 358 [74 Cal.Rptr. 713, 450 P.2d 33]; *People v. Harris* (1975) 15 Cal.3d 384, 387-389 [124 Cal.Rptr. 536, 540 P.2d 632].) Here, however, the police had more than a general description. Detective Cornell saw that appellant had a scar under his eye, like the suspect and that he drove a car which matched the suspect's car. During the detention, the pager on appellant's belt activated displaying the private investigator's 800 phone number. Before the arrest, Detective Cornell asked the private investigator to continue calling the suspect's pager number to confirm that it was the same pager owned by the man who identified himself as John Beauregard.

Detective Cornell was also aware of the similarity of the two sexual assaults and appellant's proximity thereto in terms of time and distance. Several Isla Vista residents reported that John was aggressive with women, that he climbed into bed with a woman, that he licked the hand of another woman after he was ordered to leave her apartment, and that he bragged about having sexual intercourse with a woman who was afraid of him and told him to stop. When the appellant sodomized Melissa K., she complained that it was painful and begged him to stop. Appellant considered it a game and continued the anal intercourse, taking pleasure in the victim's pain and degradation.

Based on these circumstances, there was probable cause to arrest appellant. (*People v. Price, supra,* 1 Cal.4th at p. 410; *People v. Kraft* (2000) 23 Cal.4th 978, 1037 [99 Cal.Rptr.2d 1, 5 P.3d 68]; *People v. Guajardo* (1994) 23 Cal.App.4th 1738, 1742 [29 Cal.Rptr.2d 21].) Therefore, his derivative contention that the necklace, kitchen knife, and DNA evidence was the fruit of an unlawful arrest is without merit.

### Kelly/Frye Hearing

 Appellant contends that the trial court erred in denying his request for a "full *Kelly/Frye*" hearing to determine, under the first prong of *Kelly*, whether the Profiler Plus test kit is a new technique which is generally accepted by the relevant scientific community. "[U]nder the *Kelly-Frye* rule the proponent of evidence derived from a new scientific methodology must satisfy *three* prongs, by showing, first, that the reliability of the new technique has gained general acceptance in the relevant scientific community, second, that the expert testifying to that effect is qualified to do so, and, third, that ' "correct scientific procedures were used in the particular case." ' " (*People v. Roybal* (1998) 19 Cal.4th 481, 505 [19 Cal.4th 1231a, 79 Cal.Rptr.2d 487, 966 P.2d 521]; see also *People v. Allen, supra,* 72 Cal.App.4th 1093, 1098-1099.)

■ Appellant claimed that the Profiler Plus test kit was a novel testing device and moved for a "full *Kelly/Frye*" hearing based on the declaration and testimony of Christie T. Davis, Ph.D., a molecular biologist at Lexigen Science and Law Consultants, Inc., in San Francisco. Doctor Davis conducted medical research prior to 1990 using DNA but had never performed a forensic DNA test. She opined that the Profiler Plus test kit was not scientifically reliable because it had not been subjected to developmental validation and peer review in accordance with the guidelines of the Technical Work Group for Analysis Methods (TWGDAM) and the DNA Advisory Board (DAB). Doctor Davis explained that "developmental validation" is a means of testing a new scientific technique to see if it works. The data is then submitted to the scientific "community to see what kind of feedback or issues they might have. So the peer review part would be to get it into a publication where the [scientific] community could review it."

The Profiler Plus test kit, manufactured by the Perkin-Elmer Corporation, uses a polymerase chain reaction/short tandem repeat (PCR/STR) testing methodology. The test kit manual states that Perkin-Elmer Corporation had conducted development validation in accordance with TWGDAM and DAB guidelines.

Doctor Davis took issue with the manual because the validation data had not been publicly released for peer review. The Perkin-Elmer Corporation claimed that the data was proprietary. Doctor Davis opined that it would take "years" to conduct peer review validation because the Profiler Plus test kit uses different loci then other PCR/STR test kits. On cross-examination, she admitted that the FBI, the California Department of Justice, and the majority of forensic DNA labs use the Profiler Plus test kit.

The trial court denied appellant's motion to conduct a *Kelly/Frye* hearing to determine the scientific reliability of the Profiler Plus test "without prejudice to the defense to go into that by way of a[n Evidence Code section] 402 hearing . . . ." In a written order, the trial court found that Doctor Davis has "opined that the PCR process, and the STR testing method, are reliable and appropriate tests to use in this type of suspect identification testing, so long as certain conditions are met, such as only one source of sample DNA being present at the crime scene, and that neither too much nor too little DNA is presented for testing. These concerns about specific facts affecting the reliability of results in one specific instance are appropriate for exploration at trial, but they do not require a Kelly hearing, because they do not implicate the reliability or general scientific acceptance of the principles on which the tests are based. The defense expert essentially admitted that both PCR and STR processes are generally accepted in the scientific community, and that the principles on which those testing modes are used are

accepted for many scientific purposes, among which, inter alia, are forensic uses such as comparison and identification of criminal suspects from samples at crime scenes."

■ On appeal, the "general acceptance" finding under prong one of *Kelly* is " 'a mixed question of law and fact subject to limited de novo review.' [Citation.] '[W]e review the trial court's determination with deference to any and all supportable findings of 'historical' fact or credibility, and then decide as a matter of law, based on those assumptions, whether there has been general acceptance.' [Citation.]" (*People v. Morganti* (1996) 43 Cal.App.4th 643, 663 [50 Cal.Rptr.2d 837].) Where a trial court has admitted a new scientific test and the decision is affirmed in a published opinion, "the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*People v. Kelly, supra,* 17 Cal.3d at p. 32.) Trial courts may also rely on out-of-state cases to ascertain whether a new scientific test has been accepted. (*People v. Allen, supra,* 72 Cal.App.4th at p. 1099.)

■ California courts have recognized that two methodologies are widely used in forensic DNA testing: restriction fragment length polymorphism (RFLP) and PCR. (*People v. Venegas* (1998) 18 Cal.4th 47, 57-58 & fn. 6 [74 Cal.Rptr.2d 262, 954 P.2d 525].) There are three subtypes of PCR testing: DQ-Alpha, which tests a single genetic marker; Polymarker, which tests five genetic markers; and the STR, which tests three or more genetic markers. (*People v. Allen, supra,* 72 Cal.App.4th at p. 1097.) The RFLP and PCR methodologies, including the PCR subtypes, have acquired general acceptance in the scientific community. (*People v. Venegas, supra,* 18 Cal.4th at p. 79 [RFLP]; *People v. Wright* (1998) 62 Cal.App.4th 31, 34 [72 Cal.Rptr.2d 246] [PCR/Polymarker); *People v. Morganti, supra,* 43 Cal.App.4th at p. 666 [PCR/DQ-Alpha]; *People v. Allen, supra,* 72 Cal.App.4th at p. 1100 [PCR/STR].)

At the subsequent Evidence Code section 402 hearing, Doctor Davis testified that the DNA tests approved in *People v. Allen, supra,* 72 Cal.App.4th 1093, *People v. Wright, supra,* 62 Cal.App.4th 31, and *People v. Morganti, supra,* 43 Cal.App.4th 643, use different genetic markers and primers to target the gene sites (loci). For example, the Promega test kit in *People v. Allen* uses four loci and requires eight primers. The Profiler Plus test kit uses 10 loci and requires 20 primers. Unlike the DNA test kits in *Allen, Morganti* and *Wright,* which use a reverse dot blot to visually identify the targeted gene, the Profiler Plus kit uses fluorescent tagging. After the primer is mixed with the DNA, it is illuminated with a laser. The tags in the primer are excited by the laser and glow blue, green, or yellow. The

fluorescent glow is recorded by a camera, digitized by computer software, and analyzed by another computer program.

The trial court reasonably concluded that Doctor Davis's concerns about the Profiler Plus test kit went to prong three of *Kelly*, i.e., whether the procedures utilized by the forensic lab were in compliance with PCR/STR methodology. (E.g., *People v. Venegas, supra,* 18 Cal.4th at p. 78; *People v. Soto* (1999) 21 Cal.4th 512, 529 [88 Cal.Rptr.2d 34, 981 P.2d 958].) ■ "All that is necessary in the limited third-prong hearing is a foundational showing that correct scientific procedures were used." (*People v. Barney* (1992) 8 Cal.App.4th 798, 825 [10 Cal.Rptr.2d 731].) ■ Appellant does not contend that a prong three *Kelly* hearing was required to determine whether proper scientific procedures were used or whether the statistical data derived from the Profiler Plus test was correct.

We reject the argument that each new PCR/STR test kit must, as a matter of law, be subjected to a *Kelly* prong one analysis to determine scientific reliability. (E.g., *People v. Bury* (1996) 41 Cal.App.4th 1194, 1202 [49 Cal.Rptr.2d 107] [*Kelly/Frye* hearing not required for latest field version of breath testing device]; *People v. Cooper* (1991) 53 Cal.3d 771, 812-813 [281 Cal.Rptr. 90, 809 P.2d 865] [once electrophoresis testing is admitted by a court, criticism of specific methodology goes to weight of the evidence]; *People v. Smith* (1989) 215 Cal.App.3d 19, 26-27, fn. 4 [263 Cal.Rptr. 678] [electrophoresis testing of dried bloodstains]; *People v. Venegas, supra,* 18 Cal.4th at pp. 78-79 [basic RFLP methodology for DNA tests used in different test kits].) The *Kelly* prong one analysis applies to "new scientific techniques." (*People v. Kelly, supra,* 17 Cal.3d at pp. 30-31; *People v. Venegas, supra,* 18 Cal.4th at p. 78.) Doctor Davis stated that STR forensic analysis is "pretty widespread." This is not a case in which the scientific community view the test methodology "as experimental or of dubious validity." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156 [265 Cal.Rptr. 111, 783 P.2d 698].)

Although the Profiler Plus test kit manual stated that TWGDAM developmental validation tests had been conducted, Doctor Davis did not consider it to be a "peer review publication because it's [Perkin-Elmer Corporation's] manual and they wrote it . . . ." The trial court did not find Doctor Davis's opinion persuasive, Nor do we. General acceptance in the scientific community may be established by the testimony of a director or supervisor of a DNA forensic lab. (*People v. Allen, supra,* 72 Cal.App.4th 1093, 1099; *State v. Jackson* (1998) 255 Neb. 68 [582 N.W.2d 317, 325] [testimony by DNA lab director that PCR/STR testing is "generally accepted"].) Doctor Davis admitted that the Profiler Plus kit is used by the California Department of

Justice, the FBI, and the majority of forensic labs conducting DNA tests. Other state courts have held that PCR/STR testing is generally accepted in the scientific community. (*State v. Jackson, supra,* 582 N.W.2d at p. 325 [PCR/STR testing has " 'been around several years now, and there is nothing unique about PCR STR versus any PCR' "]; *Com. v. Rosier* (1997) 425 Mass. 807 [685 N.E.2d 739, 813] [PCR/STR testing scientifically valid].)

Equally without merit is the argument that TWGDAM guidelines on developmental validation of DNA test kits are mandatory and the sine qua non for admissibility. Based on appellant's construction of the law, the Profiler Plus test kit will never survive a *Kelly* prong 1 analysis unless and until the manufacturer releases the validation data to the general scientific community. TWGDAM guidelines, however, are advisory. (*State v. Tankersley* (1998) 191 Ariz. 359 [956 P.2d 486, 493].) They were established by the FBI in 1991 as interim guidelines for federal and state forensic labs. (*Fugate v. Com.* (Ky. 1999) 993 S.W.2d 931, 935-936; 1st Internat. DNA User's Conference (Nov. 24-26, 1999) Lyons, France; <http://www.interpol.int/public/forensic/dna/conference/qualityassurance03.asp> [as of Apr. 4, 2001].) In 1994 Congress enacted the DNA Identification Act to create the DAB to recommend quality assurance standards for forensic DNA labs and convicted offender DNA databasing labs. (42 U.S.C. §§ 3751 et seq., 14131(a)(1)(C)(4).) Based on DAB's recommendations, the Director of the FBI issued quality assurance standards in 1998 for the Combined DNA Index System and the national DNA database index. (FBI Congressional Statement on Forensic DNA Analysis (Mar. 23, 2000) <http:/www.fbi.gov/congress/congress00/dadams.htm> [as of Apr. 4, 2001].) The DAB recommendations, which supersede TWGDAM guidelines, do not require that scientists developing new DNA technologies publish developmental validation studies in peer reviewed scientific journals.

Lisa Calandro, the lab supervisor at Forensic Analytical, testified that TWGDAM guidelines are recommended guidelines and that developmental validation "may be done by the manufacturer or it may be done in other laboratories outside of the manufacturer. In this case, it was done both by manufacturer and in other laboratories." Calandro stated that the Profiler Plus test kit has been extant since 1997 and that the California Department of Justice and the Santa Clara County Crime Laboratory have conducted developmental validation tests on the Profiler Plus test kit. Calandro testified that the majority of DNA laboratories, including the FBI and the California Department of Justice use the Profiler Plus test kit and that the California DNA database and the national DNA database are "being switched over to

Profiler Plus" because "PCR-based systems are very discriminating."[4] Calandro's testimony was uncontroverted, credited by the trial court, and ultimately accepted by the jury.

The Profiler Plus test kit does not embrace new scientific techniques. To the contrary, it uses the PCR and STR testing methods, which are generally accepted by the scientific community. It is just more sophisticated because it examines a greater number of genetic markers. The test result will exonerate the innocent and, as here, will seal the fate of the guilty.

The judgment is affirmed.

Gilbert, P. J., and Coffee, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 29, 2001.

---

[4] Section 299.5, subdivision (j) of the California DNA and Forensic Identification Data Base and Data Bank Act of 1998 provides: "The Department of Justice shall make public the methodology and procedures to be used in its DNA program prior to the commencement of DNA testing in its laboratories. The Department of Justice shall review and consider on an ongoing basis the findings and results of any peer review and validation studies submitted to the department by members of the relevant scientific community experienced in the use of DNA technology. This material shall be available to criminal defense counsel upon court order made pursuant to Chapter 10 (commencing with Section 1054) of Title 6 of Part 2."