804 A.2d 604 (2002)
354 N.J. Super. 76
STATE of New Jersey Plaintiff,
v.
Anthony DELOATCH, Defendant.
Superior Court of New Jersey, Law Division.
January 18, 2002.
*605 Leslie J. Mann, Assistant Prosecutor and Robert D. Laurino, Deputy Chief Assistant Prosecutor, for the State.
William C. Strauss, Deputy Public Defender, for Defendant.
VENA, J.S.C.
Defendant, Anthony Deloatch, requested a hearing pursuant to N.J.R.E. § 702, to determine the admissibility of DNA evidence proposed by the State through the use of a DNA identification procedure known as Short Tandem Repeat (STR). The State claims that the STR has linked defendant to the crimes charged in the indictment, including the attempted murder of an elderly woman.
Use of DNA testing technology to identify or exclude a suspect may no longer be considered a novel scientific technique requiring a hearing pursuant to N.J.R.E. § 702. State v. Marcus, 294 N.J.Super. 267, 683 A.2d 221 (App.Div.1996) certif. denied 157 N.J. 543, 724 A.2d 803 (1998), State v. Dishon, 297 N.J.Super. 254, 687 A.2d 1074 (App.Div.1996) certif. denied 149 N.J. 144, 693 A.2d 112 (1997), State v. Harvey, 151 N.J. 117, 699 A.2d 596 (1997). However, as newer technology has developed enabling law enforcement to use smaller samples more expeditiously and less expensively, trial courts can not admit evidence produced through the use of the newer technology absent acceptance of the technology by an appellate court of this State. State v. Doriguzzi, 334 N.J.Super. 530, 533, 760 A.2d 336 (App.Div.2000). Absent Appellate Division or Supreme Court approval of a new technology, trial courts are obliged to conduct a hearing to determine if the proposed test is one considered generally accepted in the relevant scientific community. Id. At that hearing, commonly known as a Frye[1] hearing, the court determines scientific acceptance as may be demonstrated by expert testimony, scientific and legal writings and judicial opinions acknowledging general scientific acceptance. Harvey, supra, at 170, 699 A.2d 596.
There being no Appellate Division or Supreme Court opinion recognizing the admissibility of STR testing, the defendant's request for a Frye hearing was granted.[2] The State's burden as the proponent of the proffered evidence, is to "clearly establish" that the test is generally accepted in the scientific community. Harvey, supra, at 170, 699 A.2d 596.
A hearing was held, at which the court heard the expert testimony of the State's Principal Forensic Scientist, Edward J. LaRue. While the defense had indicated its intent to call as an expert witness on this issue, a Dr. William M. Shields, he was never produced.
The court has considered the testimony of LaRue, the scientific reports admitted in evidence, as well as letter memoranda *606 submitted by the State together with published opinions of appellate courts throughout the United States as cited herein.
The defense offered no specific criticism of STR and relied solely on the obligation of the State to meet its burden in proffering scientific evidence. No expert was called by the defendant and no scientific reports were even offered as evidence. Cross examination of the State's expert was limited in scope and has had no practical effect.
The defense limited its attack to the proffering of unpublished, mostly reversed or overruled, trial court opinions from out of State. One can not divine the basis upon which the defendant challenged the STR scientific reliability. Suffice it to say, however, as shall be developed more fully hereafter, the cases upon which the defense relies do not challenge the STR technology but only the commercial kits (Cellmark's Profiler Plus & Cofiler, and Genelex PowerPlex) used in the analysis. Here there is no evidence offered attacking those kits or their use here.
This court concludes as a result thereof that the STR methodology used to analyze DNA substances is generally accepted for use by the scientific community and is, therefore, admissible in this court.

DNA
DNA (deoxyribonucleic acid) is a compound found within the nucleus of the cells of the body which appear as a double helix or twisted ladder. The ladders are pairs of cell bases or "nucleotides" abbreviated as A.C.G.T. (adenine, cytosine, guanine and thymine). C bonds only with G and A bonds only with T. The order of these base pairs are an individual's genetic code. There are three to four billion such pairs in the human body (the "genome") and the sequence of pairs on a DNA strand is a gene. The possible sequence of pairs is an "allele" and the gene's location on a chromosome[3] is its locus.
No two people, except identical twins, have the same base pair sequence in their DNA regardless of where on the body the DNA is taken, i.e., blood, semen, hair, etc. This forms the basis of a revolution in identification known as DNA testing. If the base pair sequence of DNA found in one substance (say semen at a crime scene) matches another substance (say on a saliva sample taken from an individual at the county jail) then the odds are one in 100 quadrillion that the substance did not come from the same person.

DNA Analysis
There are a variety of forms of DNA testing used throughout the scientific community for a variety of identification purposes. DNA analysis is used not only to include individuals as suspects but more often than not to exclude them. The media is replete with news of convicted defendants being released as new forms of DNA testing exclude them as perpetrators of crimes for which they had been convicted.
Tragically, the events of our most recent past have shown how DNA derived from a person missing after the September 11, 2001 attack on the United States can be matched with DNA from remains found at "ground zero" and the death of the victim confirmed and the remains identified.

RFLP
The best known form of DNA testing, made famous in the O.J. Simpson case, is called RFLP[4]. In RFLP testing[5] the forensic *607 scientist identifies 15 to 30 base pairs repeated at many loci along the chromosome. To be valid, RFLP testing requires 25 to 50 times more DNA than the newer methods (thus requiring more available substance at a crime scene) and takes months to conduct.
RFLP focuses on non-functional regions of DNA known as variable-number tandem repeats (VNTRs) in these regions, which typically range from 500 to 10,000 pairs of nucleotides, a core sequence of approximately fifteen to thirty-five base pairs is repeated many times consecutively along the chromosome. The number of repeats varies among individuals. At a given locus or site on a chromosome, sequences with different numbers of repeated units are known as VNTR alleles. Because different VNTR alleles contain different numbers of repeats, these alleles can be identified by their lengths. National Research Council, The Evaluation of Forensic DNA Evidence, 14-15 (1996 NRC Report).
In RFLP analysis, the recovered DNA sample and the sample from the suspect are treated with a restriction enzyme, which seeks out a specific nucleotide pattern on the DNA helixes. It then fragments the molecules at those sites. Because of VNTRs, the location of these sites, and the lengths of the resulting fragments, differ among individuals. Through a process called "gel electrophoresis" the DNA fragments are sorted by size and split into single strands. These strands bond to a nylon membrane, where a specially treated and radioactively-tagged single strand of DNA, called a "genetic probe,"is applied. The genetic probe bonds with a targeted VNTR sequence. The nylon membrane is then placed in contact with a piece of X-ray film. The radioactivity of the probes exposes the film, producing a pattern of bands, like the bar-code on a box in a supermarket, where the probes have attached to VNTRs. This bar-code image is called an "autoradiograph" or "autorad". Fragments from different donors contain different numbers of repeat units, with a corresponding variation in the lengths of the fragments. Typically, radioactive probes need days or even weeks to expose the film. Id. at 18. Generally speaking, RFLP testing is time-consuming and may require months for a complete analysis. Ibid.

Comparison of the location of the bands reveal whether the targeted VNTR in the subject's DNA matches the DNA from the recovered genetic material. That analysis can lead with a high degree of certainty to a correlation between the DNA samples. The next step involves analysis of population statistics, which reveals the likelihood of a random match between the samples. Using single-locus probes, the probability of finding a random match between unrelated individuals on all bands of a DNA fingerprint is less than one in ten million. Using one multi-locus probe, the probability is about one in thirty-three billion. Thomas M. Fleming, Annotation, "Admissibility of DNA Identification Evidence," 84 A.L.R.4th 313, 324 (1991). State v. Harvey, supra at 158-159, 699 A.2d 596.

PCR
Recognizing the need for a technique to overcome the need for a large sample in the RFLP process, scientists created an amplification process known as Polymerase Chain Reaction (PCR).
The PCR process copies DNA fragments similar to the way DNA replicates itself during mitosis through heating the DNA sample in a thermal cycler, the process separates the helix into separate *608 strands. Primers composed of short DNA segments are added to define the target sequence of DNA. Then, a basic solution containing the enzyme DNA polymerase and the four basic nucleotides are added to the primed DNA sample. The added nucleotides pair with the exposed nucleotides on the separated target-strands in accordance with the G-C, A-T pairing rule. From the original DNA segment, two identical segments result.
The thermal cycler runs through its cycle approximately thirty-two times, amplifying the original sample by a factor of two billion. Currently, PCR technology effectively amplifies only small regions of DNA. Accordingly, PCR cannot be used to amplify longer VNTRs for RFLP testing. NRC Report, supra at 69-70.
PCR-based testing methods have several advantages over RFLP analysis. They are relatively simple processes and can yield results with a short period of time, often within twenty-four hours. Of particular importance to the present case, the PCR process also makes possible DNA tests on small amounts of genetic material. State v. Harvey, supra, at 159-160, 699 A.2d 596.
There are in use generally three types of tests that use the PCR amplification technique. The DQ Alpha Test and the Polymarker (PM) test have been acknowledged by the Appellate Courts in this State as acceptable to the scientific community and thus admissible as scientifically reliable. State v. Dishon, supra and State v. Harvey, supra.
DQ Alpha Test
The DQ Alpha test reveals an individual's form of alleles for the human-leukocyte-antigen DQ Alpha gene. The purpose of the DQ Alpha test is to identify the genotype of the two alleles that comprise the DQ Alpha gene present in the DNA sample. That result is then compared with the DQ Alpha genotype of the suspect. If the genotypes match, then the suspect cannot be excluded as a possible donor. Genetics population databases then produce the frequency with which the suspect's genotype appears in the population. Although eight alleles have been identified at the DQ Alpha locus, only six are commonly used in forensic work. Ibid. Each of those six alleles can be distinguished by specific enzyme probes. Ibid. The six alleles for DQ Alpha are denominated as, 1.1, 1.2, 1.3, 2, 3, and 4. For the DQ Alpha gene, there are twenty-one possible pair combinations or genotypes.
To interpret the results, the test uses a test strip with six chemical dots. Each dot consists of a specific enzyme probe that selectively binds to one of the six DQ Alpha alleles. Because the probes, rather than the DNA, are fixed on the membrane, this is called a "reverse" blot. Ibid. This test strip is then immersed in a solution containing the PCR product. The alleles for DQ Alpha present in the PCR product then attach to their corresponding enzyme probe on the test strip. Where the alleles bond, the dots turn blue. Two of the six dots will turn blue to indicate which two alleles constitute an individual's genotype. If an individual is homozygous, meaning that the two DQ Alpha alleles are identical, only one dot will turn blue. State v. Harvey, supra, at 161-2, 699 A.2d 596.

Polymarker (PM) Test
The PM test works like the DQ alpha test, but instead of testing for the composition of one gene, it tests for six genes. The six genes tested in the PM test are: LDLR (low density lipoprotein *609 receptor) GYPA (glycophorin A), HBGC (hemoglobin gamma globulin) D7S8, and GC (Group Component). Each of those genes consists of combinations of either two or three different alleles. A blue-dot test, similar to that used in the DQ Alpha test, determines the genotype for each gene.... the PCR test begins by amplifying the amount of DNA. Then, the DNA is passed over a polymer test strip. When the DNA finds its type on that locus, the dot changes color. Each combination of alleles is associated with a population frequency that is expressed as a percentage.
After ascertaining a sample's genotypes and population frequencies for each of the five individual genes, a mathematical formula known as the "product rule" reveals the likelihood that another individual in the relevant population would share the test subject's genotype for all five targeted genes. The product rule, which give the profile frequency in a population as a product of coefficients and allele frequencies, rests on the assumption that a population can be treated as a single, randomly mating unit. NRC Report, supra, at 5. Under the product rule, the population frequencies for each of the six genotypes are multiplied by one another. Harvey, supra, at 163, 699 A.2d 596.
A third PCR based technique was used here called Short Tandem Repeats or STR which has not been reviewed by an appellate court in New Jersey notwithstanding its widespread use here. Thus, the need for the extant analysis.

STR Testing
In Short Tandem Repeat (STR) testing a very small piece of a substance (i.e. blood, semen, etc.) is extracted and then, through a chemical process, visualized and identified as human DNA. Then, the DNA is put through the PCR reaction or amplification, i.e., what was described here as "a molecular xerox". During amplification the DNA is heated to "unzip" it, a primer of DNA (the "control DNA") is added enabling a "spot" to be "tagged" or "marked" and repeated or copied over 13 loci and as much as 16 loci. This science enables the tester to identify 10 markers over as much as 16 loci with sensitivity levels as low as one nanogram of DNA. (One nanogram being approximately 333 allele copies).
Following the PCR amplification the product is examined on a Genetic Analyzer through a process called capillary electrophoresis during which the product is electrically charged. (A process that can be done overnight in a lab without human supervision). This causes the tag that was placed on the primer DNA to fluoresce. Then through the use of the Profiler Plus and the Cofiler,[6] 13 loci profiles are created from the small sample examined that can be compared to another profile from another sample. Only if all 13 loci match will the forensic scientist so declare. As noted, the odds of a match to a person not an identical twin is one in 100 quadrillion.

Validation
If it works, STR will revolutionize the identification process. The process by which scientists determine the scientific utility of a process is called validation. Much like the legal authentication process, the scientist looks to prove that a test does (or does not) do what it purports to do.
Validation is both developmental and internal. Developmental validation proves *610 the legitimacy of a technique or scientific process. Internal validation proves the reliability of the process at your laboratory.
Developmental validation of DNA testing follows guidelines set by Boards of scientists, lawyers and statisticians and conducted by manufacturers and cooperating laboratories for manufacturers. Internal validation here of STR was conducted by the New Jersey State Police. The validation report describes the proficiency tests made to ensure the ability to conduct a valid test.

Analysis
As a Frye jurisdiction, and as compelled by N.J.R.E. § 702 (see Harvey, Supra and Doriguzzi, supra), the State as proponent of STR technique bears the burden of showing that the process producing evidence it seeks to admit is generally accepted in the scientific community. In the course of considering whether the scientific community has generally accepted a technique, this court is guided by the admonition in State v. Harvey, supra, and cases cited therein that general acceptance does not mean complete agreement or unanimity of scientific concurrence. While 100% acceptance is a goal to be strived for, judicial acknowledgment cannot await achievement of this lofty purpose. To do so would leave the criminal justice system few tools available to it.
[2] General acceptance can be proven by the proponent of a scientific process in three ways:
(1) by expert testimony as to general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis;
(2) by authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; and
(3) by judicial opinions that indicate the expert's premises have gained general acceptance. State v. Kelly, 97 N.J. 178, 210, 478 A.2d 364 (1984).
Edward J. LaRue is the Principal Forensic Scientist at the New Jersey State Police and supervises its DNA unit. In that capacity he supervises all DNA testing done by the State Police for law enforcement. He is and has been a Diplomat of the American Board of Criminalistics (ABC). He has published and presented in the use of DNA/STR and has been accepted as an expert in DNA/STR in a variety of vicinages of the Superior Court of this State. He was accepted by this court as an expert witness without objection.
LaRue described the process by which the State conducted its internal validation of the STR process in its lab (S-1) while explaining the science that forms the basis for DNA testing generally and the STR process specifically. However, the true import of his testimony was in the description of how STR has become the most common accepted means of DNA testing in the scientific community.
In support of that proposition, LaRue cited the National Research Council description of the molecular technology forming the basis of STR testing as "highly sound" (S-2). Even more significantly, LaRue provided references to more than 1500 scholarly works accepted as authoritative in the scientific community that conclude that STR technology is valid and reliable. (S-3).
These studies, together with his lab's validation and the developmental evaluation performed by the commercial equipment manufacturer (Perkin Elmer) pursuant to the guidelines set by a group of forensic DNA analysts from government and private laboratories considered authoritative *611 in the field, the Technical Working Group on DNA Analysis Methods (TWGDAM,), form the basis for his expert conclusion that the science used in STR testing has been generally acceptable in the scientific community.
LaRue notes that New Jersey is hardly alone in this view. Forty-Eight States and the FBI use and recognize STR. A June 2000 survey reports its use commonly in well over 100 laboratories.
Studies consistently show that in a world population of 6 billion, the odds of a DNA match of two persons not identical twins is one in 100 quadrillion. LaRue states that the standard for a reasonable degree of scientific certainty is one in 260 billion. Therefore, he concludes, the virtual universal acceptance of STR is more than reasonable.
No expert opinion was offered by defendant to contest the conclusions reached by LaRue.
In addition to the 1500 writings offered by the State, the court was also directed to the opinion of the Court in United States v. Trala, 162 F.Supp.2d 336 (D.Del.2001), where the Court noted the existence of "numerous published articles" accepting the technique as sound. The court was also supplied three complete studies (in addition to the validation study done by the State Police,) describing in detail STR reliability and acceptance.
No scientific writings holding a contrary view were offered by the defense.
New Jersey's Appellate Courts have been without hesitation in recognizing the scientific reliability and acceptance of the various DNA analysis techniques beginning with acceptance of DNA identification reliability in State v. Marcus, 294 N.J.Super. 267, 274, 683 A.2d 221 (App.Div.1996) certif. denied 157 N.J. 543, 724 A.2d 803 (1998). In the course of approving the RFLP method of DNA analysis for use in New Jersey, the court, noting the "highly reliable results obtained" said:
... the introduction of these results into evidence at a criminal trial would clearly aid the jury in performing its fact finding responsibilities. The mere existence of a genuine dispute as to whether the probability of a random match of DNA samples is one in 4.7 billion, one in 3.4 million or even some lesser number, should not prevent the trier of fact from hearing evidence which has a high degree of reliability. For scientific evidence to be admissible, we only require that the scientific technique be accepted as scientifically reliable, not that it produce results that are beyond all legitimate debate. In fact, it is commonplace in our courtrooms for juries to hear conflicting expert opinions regarding the precise significance of scientific tests. Marcus, supra, at 287, 683 A.2d 221.
Shortly after deciding Marcus, the Appellate Division approved as scientifically and legally reliable and accepted in the scientific community, the much more revolutionary PCR amplification technique and did so without the traditional Frye testimonial hearing. State v. Dishon, 297 N.J.Super. 254, 687 A.2d 1074, certif. denied, 149 N.J. 144, 693 A.2d 112 (1997). While the STR form of PCR-DNA testing existed at the time its specific reliability was not directly addressed since its sister technique, the DQ alpha test had been employed and was deemed generally acceptable to the scientific community. Dishon, at 276-278, 687 A.2d 1074.
Closely following Dishon came the most comprehensive and authoritative opinion in New Jersey on DNA testing techniques. State v. Harvey, supra. Once again as the technology advanced so did the court's approval of its reliability in accepting as admissible another PCR-DNA test much like *612 the DQ Alpha test, the Polymarker (PM) Test. Id. at 176, 699 A.2d 596.
Now the next generation of PCR-DNA testing techniques are before the New Jersey Courts ripe for scientific reliability and acceptance review. As noted there are no opinions of appellate tribunals in the State on the STR technique. We, therefore, welcome the views of appellate courts in sister states who have ruled thereupon, keeping cognizant of the New Jersey Appellate Division and Supreme Court's approval of DNA testing generally and PCR techniques specifically in Marcus, Dishon, and Harvey.
As noted above, New Jersey retains the Frye standard on the admission of expert/scientific evidence. Other states have adopted the more relaxed Daubert standard requiring only a finding that the scientific test results and expert testimony would assist the fact-finder and that the results of any test were scientifically valid and reliable. Notwithstanding that distinction, every reported appellate level decision nationwide has approved the scientific reliability and acceptability of the STR technique.
The first reported case to address STR is Commonwealth v. Rosier, 425 Mass. 807, 685 N.E.2d 739 (1997) where that state's highest court, the Supreme Judicial Court, unanimously approved the use of STR derived evidence. In Rosier, supra, the court acknowledged the absence of decisional law at that time but accepted the widespread use of STR (including its use to identify remains of soldiers killed in Operation Desert Storm), its approval in scholarly reports such as The National Research Council (NRC) Evaluation of Forensic DNA evidence in 1996, and the expert testimony before the trial court as a sufficient basis for a finding of scientific validity and reliability and, therefore, admissibility under the more relaxed Daubert, supra, standard.
The following year, 1998, the Nebraska Supreme Court in State v. Jackson, 255 Neb. 68, 582 N.W.2d 317 (1998) approved the use of STR technology under Frye, supra, essentially accepting the expert testimony before the trial court.
In 1999 California, like New Jersey a Frye state, first addressed STR-DNA in a reported appellant level case in People v. Allen, 72 Cal.App.4th 1093, 85 Cal.Rptr.2d 655 (1999). In citing both Rosier, supra, and Jackson, supra, the Allen, supra, Court relied on both as authoritative and sufficiently convincing to permit reliance in California.
Two years later, in May of 2001, the California appeals court once again addressed the issue in People v. Hill, 89 Cal.App.4th 48, 107 Cal.Rptr.2d 110 (2001), citing Rosier, supra and Jackson, supra, together with its previous opinion in Allen, supra, and applying the Frye standard, finds STR-DNA with such widespread acceptance as to obviate a need for a Frye testimonial hearing on scientific acceptability.
The year 2001 brought three more states issuing opinions supporting the scientific acceptance and reliability of STR-DNA tests. Citing the Massachusetts, Nebraska and California cases, as well as numerous unreported trial court opinions, the New York Supreme Court (a trial court) in People v. Owens, 187 Misc.2d 838, 725 N.Y.S.2d 178 (2001) approved the use of STR-DNA in the identification process. Joining, in that month, was the Colorado Supreme Court in People v. Shreck, 22 P.3d 68 (Colo.2001) finding STR techniques scientifically acceptable and reliable. Three months thereafter, the Utah Supreme Court in State v. Butterfield, 27 P.3d 1133 (Utah 2001) was so persuaded by the numerous studies and the opinions *613 of the Courts in California, Massachusetts and Nebraska, that it took judicial notice of STR-DNA scientific acceptance and reliability.
It would appear that every appellate court in the nation that has addressed the issue has accepted the scientific reliability of STR technology. With one exception, the only cases cited in opposition to the admissibility of STRs are unpublished and reversed or overruled. People v. Bolkin, SCN:168461 (unpublished) Superior Court of California, May 6, 1999, was overruled sub silencio, in People v. Allen, supra and People v. Shreck, Case No. 98CR2475, District Court of Boulder, State of Colorado (Unpublished, 2000) was reversed by the Colorado Supreme Court in People v. Shreck, 22 P.3d 68 (Colo.2001). In any event, the Bolkin and Shreck trial courts accepted the STR-DNA technology but found that the most recent form of STR, as used in the commercial kits used here, had been, as yet, insufficiently validated. I found those arguments unpersuasive, especially in light of the failure of the defense here to mount any challenge to the expert testimony before me supporting the validation.
That leaves us only the Vermont trial court's unpublished opinion in State v. Pfenning, Docket No. 57-4-96, Vermont District Court (Unpublished 2000) which, to the court's knowledge, has neither been accepted nor rejected by that state's appellate courts. However, that court, like the courts whose opinions have been rejected on appellate review, supports STR reliability but finds the commercial kits employing the technology to be insufficiently validated. As noted above, this court rejects that proposition.

Conclusion
Applying the Kelly/Frye criteria, this court finds that the State has proved that the STR technique of the PCR method of DNA testing is sufficiently reliable and generally accepted in the scientific community and therefore admissible.
NOTES
[1] Frye v. United States, 293 F. 1013 (D.C.Cir.1923) was replaced as the federal standard for the more relaxed one set out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). New Jersey has retained the Frye standard in criminal cases. State v. Harvey, Supra at 169-170, 699 A.2d 596.
[2] The STR method has been accepted by trial courts in this State. Notably, the only known written opinion was issued by Hon. George H. Stanger, Jr., A.J.S.C. on September 5, 2000, and appears as Exhibit Three attached to the State's letter brief dated October 24, 2001.
[3] There are 23 in human blood, 46 in total. They are simply tightly packed DNA.
[4] Restriction fragment length polymorphism.
[5] Recognized as scientifically accepted in State v. Marcus, 294 N.J.Super. 267, 683 A.2d 221 (App.Div.1996).
[6] These kits are extensively used for this purpose by the forensic scientific community throughout the country.