**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1665-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ORION BYRD, a/k/a
BYRD ORION, TORRES
ORLANDO, RICHARD
SIMMONS, RICHARD
SIMMONS TORRES, and
ORLANDO TORRES,

    Defendant-Appellant.

_____

Argued February 27, 2024 – Decided April 21, 2025

Before Judges Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment Nos. 17-06-0471 and 17-06-0472.

Morgan A. Birck, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Morgan A. Birck and Marcia Blum, Assistant Deputy Public Defender, of counsel and on the briefs).

Amanda G. Schwartz, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Amanda G. Schwartz, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Following a jury trial, defendant Orion Byrd was convicted of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1), and fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-9(e). After the trial, defendant entered a guilty plea to second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1), and was sentenced to an aggregate extended term of thirteen years in prison, with a six-and-one-half-year parole disqualifier.

The charges stemmed from a motor vehicle stop of defendant's vehicle while it was being driven by defendant's then girlfriend who consented to a search of the car and made statements incriminating defendant when contraband was found inside. The search uncovered controlled dangerous substances (CDS) under the driver's seat and a defaced handgun in the trunk. At trial, defendant was tied to the gun by STRmix DNA analysis. He was also connected to the crimes by a recorded phone conversation with a Middlesex County Prosecutor's

Office (MCPO) detective, during which defendant admitted ownership of the

contents of the impounded vehicle in an attempt to retrieve his property.

On appeal, defendant raises the following points for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING
> DEFENDANT'S MOTION TO SUPPRESS BECAUSE
> THE POLICE DID NOT HAVE THE REQUISITE
> PARTICULARIZED SUSPICION TO STOP THE
> BLACK BMW.[1]
>
> POINT II
>
> THE TRIAL COURT ERRED IN ALLOWING THE
> STATE TO INTRODUCE IN EVIDENCE THE
> RECORDED PHONE CALL WHERE DEFENDANT
> WAS ATTEMPTING TO RETRIEVE HIS
> PROPERTY FROM POLICE.
>
> POINT III
>
> THE HANDGUN PERMIT APPLICATION PROCESS
> AT THE TIME OF DEFENDANT'S ALLEGED
> POSSESSION OF THE HANDGUN CONTAINED A
> REQUIREMENT THAT UNCONSTITUTIONALLY
> PRECLUDED HIM FROM BEING ELIGIBLE TO
> RECEIVE SAID PERMIT. ACCORDINGLY, HIS
> CONVICTION FOR FAILING TO COMPLY WITH A
> FACIALLY UNCONSTITUTIONAL PERMITTING
> PROCESS CANNOT STAND. (NOT RAISED
> BELOW)

---

[1] Defendant made the same argument in a pro se supplemental brief.

A-1665-21

POINT IV

BECAUSE POSSESSION OF A DEFACED FIREARM IS PROTECTED CONDUCT UNDER THE SECOND AMENDMENT AND [ITS CRIMINALIZATION] IS INCONSISTENT WITH HISTORICAL TRADITION AT THE TIME OF THE FOUNDING, THE STATUTE IS UNCONSTITUTIONAL AND DEFENDANT'S CONVICTION MUST BE REVERSED. (NOT RAISED BELOW)

POINT V

BECAUSE STRMIX IS A NOVEL FORENSIC TESTING METHOD WHOSE RELIABILITY AND GENERAL ACCEPTANCE, BOTH IN GENERAL AND AS APPLIED, HAVE NOT BEEN ACCEPTED IN NEW JERSEY, THIS COURT MUST REMAND FOR A HEARING TO DETERMINE ITS RELIABILITY. (NOT RAISED BELOW)

A. STRmix Is Dramatically Different Than Traditional DNA Analysis and Its Reliability Has Never Been Established in New Jersey.

B. The Appellate Division Has Already Recognized That a Frye[2] Hearing Is Necessary for Probabilistic Genotyping Systems That Have Not Yet Been Found Admissible in New Jersey.

---

[2] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

POINT VI

THE SENTENCE OF [THIRTEEN] YEARS WITH A
[SIX-AND-ONE-HALF]-YEAR PAROLE BAR IS
EXCESSIVE.

By leave granted, in a supplemental brief, defendant raises the following

additional point for our consideration:

THE PERSISTENT-OFFENDER EXTENDED-TERM
IMPOSED UNDER N.J.S.A. 2C:44-3[(a)] IS
ILLEGAL AND UNCONSTITUTIONAL AND MUST
BE VACATED. (NOT RAISED BELOW)

Having reviewed the record, the parties' arguments, and the applicable legal

principles, we affirm.

I.

We glean these facts from the trial record. MCPO Detective Sean Sullivan

testified that at about 1:30 p.m. on July 28, 2016, local law enforcement officers

conducted a motor vehicle stop of a 2006 black BMW registered to defendant.

The stop occurred in the parking lot of an apartment complex in Piscataway.

Courtney Ragland, defendant's girlfriend at the time, was driving the BMW.

Ragland testified that the car belonged to defendant and defendant had asked her

to travel to the location "[t]o drop off . . . [d]rugs." Ragland was specifically

instructed by defendant to collect money in exchange for the drugs and to call

or text him upon her arrival at the location.

5

Once she arrived at the apartment complex, Ragland contacted defendant who told her to remove the drugs, which were in a "red rag," from "the trunk," "put [the drugs] . . . under the seat," and await further instructions from him. However, as soon as Ragland "got the red rag out of the trunk and put it in the front seat," two police officers approached and started questioning her. Initially, Ragland told the officers "[she] was there to meet a friend." Ultimately, Ragland admitted to the officers "that there [were] narcotics in the car" and consented to a search of the vehicle. A mobile video recording (MVR) from one of the patrol cars recorded the entire encounter and was played for the jury. Text messages between Ragland and defendant that were admitted into evidence corroborated Ragland's testimony that she was in contact with defendant during the time in question, including when she was approached by the officers and consented to the search of the car. In the texts, Ragland told defendant the officers were "searching" the car and she was "going to jail."

A K-9 unit assisted with the search of the vehicle, which yielded "a red cloth rag" under the driver's seat with "a clear plastic bag" that contained a "white powdery substance," believed to be cocaine.[3] Sullivan also found a

---

[3] Subsequent lab testing confirmed that the substance was cocaine.

loaded handgun in the vehicle's trunk. The handgun was described as a Kel-Tec Model P11, nine-millimeter, semiautomatic Luger with a defaced serial number. Ragland denied knowing that the gun was in the car and denied ever seeing the gun before, but knew that defendant had a gun because he had previously admitted to her that he owned a gun. The parties stipulated that a search by the New Jersey State Police revealed that defendant never applied for nor was issued a permit to carry or purchase a handgun.

Sullivan testified that based on the evidence discovered in the vehicle, the officers arrested Ragland and transported her to the local police department. Law enforcement officers collected the CDS, the rag, the handgun, and the ammunition as evidence, and impounded the vehicle.

MCPO Lieutenant James Napp testified that his office processed the handgun by completing "a visual inspection" and "fingerprint analysis" but found "no prints." Although a ballistics expert testified that he could not restore the serial number that had been defaced, ballistics testing revealed that the handgun was operable. Wet and dry swabs for DNA testing were taken from "the grips," "the slide," and "the magazine" of the handgun and sent to the lab. The lab separately compared the DNA from the swabs against the known DNA

7

profiles of defendant and Ragland using visual inspection and the STRmix software program.

Frank Basile, a forensic scientist and DNA analyst for the MCPO, was qualified as a DNA expert and testified for the State that STRmix returns "a statistic that gives weight to a comparison, . . . known as a likelihood ratio." He explained the ratio "compares two possible explanations for the evidence" and returns a number value reflecting the likelihood of whether the DNA came from the suspect DNA "and one other individual" or "two unrelated individuals." According to Basile, "given the DNA profile obtained from the wet and dry swabs from the grips of the pistol, it was . . . approximately 16.4 trillion times more likely" to be a "mixture of [defendant] and [an] unknown individual[]" than . . . a mixture of two unknown individuals." Basile explained that this result was "very strong support that [defendant was] a contributor to the mixture of DNA obtained from th[e] item." "[N]o conclusions could be reached regarding the likelihood that the DNA[ was] a mixture of Courtney Ragland and an unknown individual versus it being two unknown individuals."

On September 15, 2016, Napp received a phone call at the MCPO from defendant "asking for some of the stuff" that was seized during the July investigation and arrest. On January 13, 2017, Napp recorded his phone

8

conversation with defendant "to see what [defendant] would say" about the car's contents and whether he would admit to possession of the personal property inside the car. During the recorded conversation, which was played for the jury,[4] among other things, defendant confirmed his name and Social Security Number as well as the vehicle year, make, and model. Defendant also confirmed that everything inside the vehicle belonged to him and he was "the only one who use[d] th[e] car."

On June 28, 2017, defendant was charged in a five-count Union County indictment with third-degree conspiracy to possess CDS with intent to distribute, N.J.S.A. 2C:35-5(b)(3) and N.J.S.A. 2C:5-2 (count one); third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3) (count two); second-degree possession of a firearm while possessing CDS with intent to distribute, N.J.S.A. 2C:39-4.1(a) (count three); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count four); and fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-9(e) (count five). Ragland was similarly charged in the same indictment. She pled guilty to counts one and two and agreed to testify truthfully against defendant

---

[4] During her trial testimony, Ragland identified the voice in the recorded conversation as defendant's.

in exchange for the prosecutor's recommendation of a probationary sentence.[5] In a separate one-count indictment returned on the same date, June 28, 2017, defendant was charged with second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1).

After pre-trial motion practice and a multi-day jury trial conducted on various dates in August and September 2021, the jury convicted defendant of counts four and five and acquitted him of the remaining counts in the five-count indictment.[6] Following the trial, defendant pled guilty to the certain persons charge in the one-count indictment. After defendant was sentenced, the trial judge entered memorializing judgments of conviction on December 16, 2021, and this appeal followed.

## II.

In Point I, defendant argues the judge erroneously denied his motion to suppress the evidence seized without a warrant because "there was no particularized suspicion in the record for the stop of the particular black BMW," and therefore "the stop was illegal." Specifically, defendant contends

---

[5] Ragland's plea agreement was revealed to the jury during her trial testimony.

[6] At the close of the State's case, defendant's motion for judgment of acquittal, R. 3:18-1, as to all counts was denied by the trial judge.

information police obtained from a confidential source that led to the traffic stop "was completely untested" and law enforcement "failed in their surveillance to corroborate any evidence of criminal activity before stopping the BMW." Because the record contains no evidence showing when police determined the car was registered to defendant, he posits "any two-door black BMW in the vicinity . . . could have been subject to a motor vehicle stop."

At the suppression hearing, Sullivan was the sole witness for the State. Sullivan, who had participated in approximately seventy-five narcotics investigations in his law enforcement career, testified that on July 28, 2016, while assigned to the MCPO's Gangs, Guns, and Drugs Task Force, he received information from a confidential informant (CI) with whom neither he nor, to his knowledge, "any other law enforcement agency [had] previously worked." According to the CI, "a [B]lack male with a short haircut," nicknamed "O," was distributing CDS, "mainly cocaine," "throughout Middlesex County." The CI claimed to have "previously purchased narcotics from O" and told Sullivan that "O" "operated a two-door black BMW with tinted windows." The CI also said the BMW had possible hidden compartments to hide narcotics and "O" was generally "known to maintain or carry a handgun."

According to Sullivan, other task force officers identified "O" as defendant as he had been "the subject in various [narcotics] investigations" known to the officers. As a result of a database search, Sullivan also determined that defendant had "a black two-door" "2006 BMW" with tinted windows registered in his name. The database search revealed the license plate number of the BMW and matched the physical description of defendant with that provided by the CI.

Sullivan testified that the CI gave him the phone number he had used to contact "O" in the past. After Sullivan received "authorization for a consensual intercept" to record a conversation between the CI and "O", the same day, July 28, 2016, the CI contacted "O" by text message to arrange for the purchase of fourteen grams of cocaine. Through the text exchanges, which were admitted into evidence for purposes of the hearing, the CI and "O" agreed that a woman would meet with the CI at about 1:30 p.m. at an apartment complex on Birchview Drive in Piscataway to make the sale.

At the pre-arranged time and location, officers from the task force as well as the Piscataway Police Department (PPD) observed a vehicle matching the description of defendant's vehicle. At Sullivan's request, PPD officers made "a motor vehicle stop of th[e] vehicle." Officers questioned the operator and sole

12

occupant of the vehicle, who was later identified as Ragland. Ragland confirmed that she was operating defendant's vehicle and told the officers that defendant had asked her to come to the location "to sell . . . drugs." Ragland also admitted that drugs were located under the driver's seat but denied knowing the type or quantity. The entire encounter was captured on the patrol vehicle's MVR.

A K-9 unit was summoned to assist and indicated the "presence of the odor of [CDS] in several places" inside the vehicle, including the passenger door side and the trunk. As a result, Sullivan asked Ragland for consent to search the vehicle and she agreed, executing a consent to search form. The search revealed a rag under the driver's seat containing a glassine bag with a white powdery substance, believed to be cocaine, and a loaded nine-millimeter handgun in the trunk.

Following the hearing, the judge denied defendant's motion, finding that "[t]he State ha[d] met its burden . . . and established that the . . . stop and subsequent search of . . . defendant's vehicle was lawful." In an oral opinion, the judge recited the parties' arguments, credited Sullivan's testimony "in all regards," and applied the relevant case law. Critically, the judge concluded that

13

the State "demonstrated [that] the law enforcement officers had . . . specific and articulable facts . . . justifying the stop of the vehicle."

Noting that defendant was not contesting the consent to search the vehicle, the judge focused on the validity of the motor vehicle stop and the "independent corroboration of the informant's tip," reasoning:

> We do[ not] have a controlled buy here. What we do have here are, based on the totality of the circumstances, reasonable suspicion . . . corroborated by the police that exists to support the [Terry[7]] stop of . . . defendant's vehicle, the approach.
>
> . . . Here the informant . . . advised the officers that somebody named O[] was distributing cocaine in Middlesex County and that the person was known to have a gun in his possession, was a [B]lack male with short hair who used the phone number [ending in] . . . 9555, and drove a black two-door BMW with tinted windows and had a possible hidden compartment to conceal narcotics.
>
> . . . [I]nformation like . . . defendant's nickname, which was corroborated by the police prior to the approach of the vehicle, a telephone number that he use[d], a detailed description of . . . defendant's car, including registration information, . . . and when th[e] vehicle w[ould] be arriving at a certain location, all of which was corroborated, amounts to a stronger showing that the informant obtained the information from a reliable source.

---

[7] Terry v. Ohio, 392 U.S. 1 (1968).

A-1665-21

. . . [M]any facts were corroborated by the police before they actually approached th[e] vehicle, including . . . when the officers went to that pre-arranged location[] [and] observed a car matching the informant's description registered to . . . defendant pull up at th[e] parking spot.

Upon their approaching the vehicle they observed a woman to be behind the wheel of the vehicle, further corroborating what the informant had provided, information exchanged between . . . defendant and the informant, including my lady will be there in about [thirty], will be bringing it, thus, a female would be operating the car.

So . . . this independent corroboration of the informant's tip ratified the informant's veracity[ and] established the information was reliable.

Our standard of review on a suppression motion is well settled. "'When reviewing a trial court's decision to grant or deny a suppression motion, appellate courts "[ordinarily] defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record."'" State v. Smart, 253 N.J. 156, 164 (2023) (alteration in original) (quoting State v. Dunbar, 229 N.J. 521, 538 (2017)). "We defer to those findings of fact because they 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Hubbard, 222 N.J. 249, 262 (2015) (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). As such, "[w]e will set

15

aside a trial court's findings of fact only when such findings 'are clearly mistaken.'" Dunbar, 229 N.J. at 538 (quoting Hubbard, 222 N.J. at 262). "We accord no deference, however, to a trial court's interpretation of law, which we review de novo." Ibid.

Turning to the substantive legal principles, "[a] warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement." State v. Gamble, 218 N.J. 412, 425 (2014) (quoting State v. Cooke, 163 N.J. 657, 664 (2000), overruled on other grounds by State v. Witt, 223 N.J. 409 (2015)). "[T]he State bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure 'falls within one of the . . . exceptions . . . .'" State v. Elders, 192 N.J. 224, 246 (2007) (quoting State v. Pineiro, 181 N.J. 13, 19-20 (2004)).

Motor vehicle or investigatory stops, also called Terry stops, are seizures for Fourth Amendment purposes. State v. Sloane, 193 N.J. 423, 429-30 (2008). The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution both require that "ordinarily, a police officer must have a reasonable and articulable suspicion that the driver of a vehicle, or its occupants, is committing a motor-vehicle violation or a criminal or disorderly persons offense to justify a stop." State v. Scriven, 226 N.J. 20,

16

33-34 (2016).  Unless the totality of the circumstances satisfies the reasonable and articulable suspicion standard, the investigatory stop "is an 'unlawful seizure,' and evidence discovered during the course of an unconstitutional detention is subject to the exclusionary rule."  Elders, 192 N.J. at 247 (citing State v. Rodriguez, 172 N.J. 117, 132-33 (2002)).

The reasonable suspicion standard requires "some minimal level of objective justification for making the stop."  State v. Nishina, 175 N.J. 502, 511 (2003) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).  As such, "raw, inchoate suspicion grounded in speculation cannot be the basis for a valid stop." Scriven, 226 N.J. at 34.  That said, "[a]lthough reasonable suspicion is a less demanding standard than probable cause, '[n]either "inarticulate hunches" nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights.'"  State v. Nyema, 249 N.J. 509, 527-28 (2022) (second alteration in original) (quoting State v. Stovall, 170 N.J. 346, 372 (2002) (Coleman, J., concurring in part and dissenting in part)).

"Determining whether reasonable and articulable suspicion exists for an investigatory stop is a highly fact-intensive inquiry that demands evaluation of 'the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the

individual's right to be protected from unwarranted and/or overbearing police intrusions.'" Id. at 528 (quoting State v. Privott, 203 N.J. 16, 25-26 (2010)). "The principal components of a determination of reasonable suspicion . . . [are] the events which occurred leading up to the stop . . . , and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion . . . ." Stovall, 170 N.J. at 357 (alterations in original) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). Thus, "[i]t is fundamental to a totality of the circumstances analysis of whether reasonable suspicion exists that courts may consider the experience and knowledge of law enforcement officers." Id. at 363.

"An informant's tip is a factor to be considered when evaluating whether an investigatory stop is justified." State v. Golotta, 178 N.J. 205, 213 (2003). When evaluating a tip,

> [a]n informant's "veracity" and "basis of knowledge" are two highly relevant factors under the totality of the circumstances. A deficiency in one of those factors "may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." An informant's veracity may be established in a variety of ways. For example, the informant's past reliability will contribute to the informant's veracity. With regard to the informant's basis of knowledge, if the informant does not identify the basis of knowledge, a reliable basis of knowledge may nonetheless be inferred from the level

of detail and amount of hard-to-know information disclosed in the tip. Finally, independent corroboration of hard-to-know detail in the informant's tip may also greatly bolster the tip's reliability.

[State v. Zutic, 155 N.J. 103, 110-11 (1998) (citations omitted) (first quoting State v. Smith, 155 N.J. 83, 93 (1998); then quoting Illinois v. Gates, 462 U.S. 213, 233 (1983); and then citing Smith, 155 N.J. at 93, 95).]

See also State v. Sullivan, 169 N.J. 204, 212 (2001) ("[C]ourts consider an informant's veracity and his or her basis of knowledge to be the two most important factors in evaluating the informant's tip." (citing Smith, 155 N.J. at 93)).

"[I]f police corroborate 'information from which it can be inferred that the informant's tip was grounded on inside information, this corroboration is sufficient to satisfy the basis of knowledge prong' as well as the veracity prong." Smith, 155 N.J. at 95-96 (quoting Gates, 462 U.S. at 270 n.22 (White, J., concurring in the judgment)). Indeed, "courts have found no constitutional violation when there has been 'independent corroboration by the police of significant aspects of the informer's predictions[.]'" Rodriguez, 172 N.J. at 127-28 (alteration in original) (quoting Alabama v. White, 496 U.S. 325, 332 (1990)). Moreover, "[f]acts that might seem innocent when viewed in isolation can sustain a finding of reasonable suspicion when considered in the aggregate,

so long as the officer maintains an objectively reasonable belief that the collective circumstances are consistent with criminal conduct." State v. Birkenmeier, 185 N.J. 552, 562 (2006) (quoting Nishina, 175 N.J. at 511).

Applying these principles, we agree with the judge's decision denying defendant's suppression motion and affirm substantially for the reasons stated in the judge's well-reasoned oral opinion. The judge's fact finding is supported by sufficient credible evidence in the record and his legal conclusions comport with the law. We are satisfied that the independent corroboration by the police of significant aspects of the untested informant's tip was sufficient to satisfy the basis of knowledge and veracity requirements under Sullivan. The police corroboration included the officers' identification of "O" as defendant based on various narcotics investigations; the database search revealing that a car registered in defendant's name as well as defendant himself matched the CI's description; defendant's car arriving at the predetermined location at the prearranged time; and the fact that a woman was operating the vehicle as described in the text exchanges between defendant and the CI. In the totality of the circumstances, the independently corroborated CI tip provided reasonable and articulable suspicion of criminal activity to justify the motor vehicle stop.

A-1665-21

In Point II, defendant argues the admission of the recorded phone call between defendant and Napp "during the State's case-in-chief forced [defendant] to choose between his Fifth Amendment right against self-incrimination in a criminal matter and his right[] to due process under the Fourteenth Amendment." He submits that because law enforcement possessed his impounded property, the use of the recorded call presented him with the "Hobson's choice" of obtaining his seized property or incriminating himself. We disagree.

The Fifth Amendment to the United States Constitution protects an individual from being called as a witness against oneself in a criminal prosecution and being forced to "answer official questions put to [the individual] in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate [the individual] in future criminal proceedings." Lefkowitz v. Turley, 414 U.S. 70, 77 (1973). In State v. Melendez, our Supreme Court addressed the provision in the civil forfeiture statute, N.J.S.A. 2C:64-3(d), requiring a person who wishes to assert a claim to an asset seized by law enforcement to timely respond to the State's forfeiture complaint or risk losing the property. 240 N.J. 268, 272, 279 (2020).

The Court explained that persons facing criminal charges related to the property

> face an untenable choice: to forfeit their property or incriminate themselves. To defend against a forfeiture complaint, claimants who are also criminal defendants must file an answer that states their interest in the property. In other words, to assert their constitutional right not to be deprived of property without due process, they have to link themselves to alleged contraband and give up their constitutional right against self-incrimination. Alternatively, they can refuse to answer and lose their property.
>
> [Id. at 282.]

The Court concluded this was an "untenable situation," id. at 272, because "a defendant's choice to file an answer under those circumstances is not freely made" but "is fraught with coercion," id. at 282.

Here, unlike Melendez, defendant identifies no statute compelling him to file a response to retrieve his impounded property seized as part of the criminal investigation. Instead, he claims that the use of the recorded conversation between himself and Napp is a constitutional violation requiring him to choose between self-incrimination and his due process rights in his property. However, defendant's contention is unavailing. Cf. State v. Covil, 240 N.J. 448, 453-54 (2020) (distinguishing the defendant in Melendez "who was required to serve an answer in the civil forfeiture action in order to defend his interest in the disputed

22

property" from the defendant in <u>Covil</u> who "was not compelled to file any pleadings in the civil forfeiture action against him when he served his motion for a writ of replevin because the forfeiture action had been stayed").

During a Rule 104 hearing on the State's motion to admit the recorded conversation, Napp testified consistent with his trial testimony. After the hearing, the judge credited Napp's testimony and ruled that the recorded call was admissible as a statement by a party opponent under N.J.R.E. 803(b)(1), but decided to instruct the jurors that they were to decide for themselves whether they believed it was defendant on the call and whether the statement was credible. In rejecting defendant's hearsay and <u>Miranda</u>[8] objections, the judge found that "defendant was not in custody," and, although Napp had initiated the call, he did so only because "defendant had called twice before inquiring about the return of his property." The judge further found that "[t]he conversation was civil" and "cordial," with no "pressure brought to bear on . . . defendant by . . . [N]app" and "no coercion." We discern no abuse of discretion in the judge's ruling. <u>See</u> <u>State v. Garcia</u>, 245 N.J. 412, 430 (2021) ("We defer to a trial court's evidentiary ruling absent an abuse of discretion." (citing <u>State v. Nantambu</u>, 221 N.J. 390, 402 (2015))).

---

[8]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

On appeal, relying on <u>Melendez</u>, defendant raises a new argument that was not presented to the judge. However, when the call occurred, defendant was not yet charged with any criminal conduct related to the vehicle stop. Even if he had been charged at the time, no state law or action required him to make the request for his property or the admissions he made when he did. <u>Cf.</u> <u>Covil</u>, 240 N.J. at 453-54.

## IV.

In Point III, defendant argues for the first time on appeal that the imposition of criminal sanctions under N.J.S.A. 2C:39-5(b)(1) for failure to comply with this State's handgun permitting process under N.J.S.A. 2C:58-4 is a violation of the Second Amendment pursuant to the United States Supreme Court's decision in <u>N.Y. State Rifle & Pistol Ass'n v. Bruen</u>, 597 U.S. 1, 11 (2022). According to defendant, because the permitting process is "facially unconstitutional," he had "no obligation to apply for a permit he knew beforehand he could not obtain due to an unconstitutional limitation" and therefore his conviction on count four must be reversed. Defendant's interpretation of <u>Bruen</u>'s effect on our State's permitting laws is misguided.

As a threshold matter, when a party does not properly preserve an issue for appeal, we may nonetheless consider whether it rises to the level of plain

24

error under Rule 2:10-2. State v. Clark, 251 N.J. 266, 286-87 (2022). Such a high bar "requir[es] reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Trinidad, 241 N.J. 425, 445 (2020) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). Here, we discern no such error.

Under New Jersey law, "[a]ny person who knowingly has in his [or her] possession any handgun . . . without first having obtained a permit to carry the same as provided in [N.J.S.A. 2C:58-4], is guilty of a crime of the second degree." N.J.S.A. 2C:39-5(b)(1). A person with a valid permit to carry is authorized by statute to carry a handgun in any part of the State, subject to certain restrictions not relevant here. N.J.S.A. 2C:58-4(a) (1981).[9] To obtain a permit to carry a handgun, among other requirements, an individual must apply to the municipality's chief of police, or the superintendent of the State Police in certain circumstances, and have fingerprints taken and checked against the

---

[9] We refer to the versions of statutes in effect at the time of defendant's offense. As relevant here, the permit requirements under subsection (a) and the application requirements of subsection (c) in the current version of N.J.S.A. 2C:58-4 are largely unchanged. The current statutory bars against obtaining a firearm permit, N.J.S.A. 2C:58-3(c), and purchasing, owning, possessing, or controlling a firearm, N.J.S.A. 2C:39-7(b)(1), also remain largely unchanged.

records of the municipality, county, State Bureau of Identification, and Federal Bureau of Investigation. N.J.S.A. 2C:58-4(c) (1981).

At the time of defendant's offense, State law mandated that:

> No application shall be approved by the chief police officer or the superintendent unless the applicant demonstrates that he [or she] is not subject to any of the disabilities set forth in [N.J.S.A. 2C:58-3(c)], . . . is thoroughly familiar with the safe handling and use of handguns, and . . . has a justifiable need to carry a handgun.
>
> [N.J.S.A. 2C:58-4(c) (1981).]

Under N.J.S.A. 2C:58-3(c), a person is statutorily barred from obtaining a permit if he or she "has been convicted of any crime, or a disorderly persons offense involving an act of domestic violence as defined in [N.J.S.A. 2C:25-19], whether or not armed with or possessing a weapon at the time of such offense." N.J.S.A. 2C:58-3(c) (2013). In addition, under N.J.S.A. 2C:39-7(b)(1) (2004), individuals previously convicted of certain offenses are wholly disqualified from purchasing, owning, possessing or controlling a firearm.

In Bruen, the United States Supreme Court addressed whether New York's firearms "licensing regime," which required applicants to show a "special need" for concealed carry, violated the Second Amendment. 597 U.S. at 8-11. The Court struck down New York's "special need" requirement, id. at 70-71, and

explicitly noted that New Jersey's "justifiable need" requirement, then codified at N.J.S.A. 2C:58-4(c), was analogous to New York's unconstitutional standard, id. at 15 n.2. N.J.S.A. 2C:58-4 has since been amended to delete the "justifiable need" provision rendered unconstitutional in Bruen, while retaining the "licensing regime" that otherwise regulated the permitting process. L. 2022, c. 131, § 3 (codified at N.J.S.A. 2C:58-4); see State v. Wade, 476 N.J. Super. 490, 510 (App. Div. 2023) ("The Legislature deleted the justifiable need provision but left in and revised various other criteria for obtaining a permit to carry a gun in New Jersey." (citing N.J.S.A. 2C:58-4)).

After Bruen was decided, the New Jersey Attorney General issued guidance on the subject. See Off. of the Att'y Gen., Law Enf't Directive No. 2022-07, Directive Clarifying Requirements for Carrying of Firearms in Public (June 24, 2022) (the Directive). The Directive acknowledged that Bruen "prevents us from continuing to require a demonstration of justifiable need in order to carry a firearm, but it does not prevent us from enforcing the other requirements in our law." Id. at 1. Although Bruen's unconstitutional holding precipitated a significant change to the criteria used to determine whether to issue a firearm carry permit in this State, it did not eliminate the need to obtain a permit before carrying a loaded handgun in public. See Wade, 476 N.J. Super.

at 509-10 (concluding this State's handgun permitting statutes were severable because our Legislature "intended to enforce the valid provisions of the statutes regulating guns if any provision was found to be unconstitutional" (citing N.J.S.A. 1:1-10)).

Bruen took aim at laws that it deemed unconstitutional, not public policies meant to advance public safety by limiting access to firearms by those who are deemed to be qualified and obtain the proper license. See Matter of M.U.'s Application for a Handgun Purchase Permit, 475 N.J. Super. 148, 184 (App. Div. 2023) ("[I]t is well-rooted in the nation's history and tradition of firearm regulation that persons convicted of crimes, regardless of whether their crimes involved violence, are not protected by the Second Amendment"). Thus, contrary to defendant's claim, Bruen does not stand for the proposition that the Second Amendment permits the wholesale and unlimited right to carry in flagrant disregard for valid state permitting laws. "The Supreme Court's repeated characterization of Second Amendment rights as belonging to 'law-abiding' citizens supports this conclusion." M.U., 475 N.J. Super. at 193-94 (quoting Bruen, 597 U.S. at 9).

Instead, Bruen and its progeny

> make[] clear that carrying guns in public can still be
> regulated and subject to a permit requirement.

> Consequently, at a minimum, New Jersey's gun-permit statutes were and continue to be constitutional in requiring background checks to confirm that the applicant is not a convicted felon or does not have a mental disability and to ensure that the applicant has reasonable training in the safe handling of guns.
>
> [Wade, 476 N.J. Super. at 510-11 (citing Bruen, 597 U.S. at 38 n.9).]

Here, the record is clear that defendant never applied for a permit and did not have a permit to carry at the time of the present offense. Furthermore, given defendant's prior criminal history, he was statutorily barred from obtaining a permit pursuant to N.J.S.A. 2C:58-3(c). In Wade, we held that a defendant has no standing to challenge the gun-permit statutes without first having applied for a permit. Id. at 511. We reach the same conclusion here. Nonetheless, even considering defendant's constitutional challenge on the merits, we hold that because "the justifiable need requirement in N.J.S.A. 2C:58-4(c) (2018) was severable and the remaining provisions of N.J.S.A. 2C:58-4 (2018), as well as N.J.S.A. 2C:39-5(b)(1), were constitutional and enforceable," Wade, 476 N.J. Super. at 511, defendant was properly prosecuted and convicted for violating N.J.S.A. 2C:39-5(b)(1) as charged in count four.

V.

We likewise reject defendant's Point IV, also raised for the first time on appeal, in which he challenges the constitutionality of N.J.S.A. 2C:39-9(e). He argues that Bruen renders unconstitutional this State's prohibition on possession of a firearm without a serial number or that is otherwise defaced. He asserts the statute "is unconstitutional facially and as applied to [him]."

Under N.J.S.A. 2C:39-9(e), "[a]ny person who knowingly buys, receives, disposes of or conceals a defaced firearm, except an antique firearm or an antique handgun, is guilty of a crime of the fourth degree." Under the same provision, "[a]ny person who defaces any firearm is guilty of a crime of the third degree." Ibid.

In Bruen, the Supreme Court renounced its previous two-step test to determine the constitutionality of a firearm regulation statute in the face of a Second Amendment challenge. 597 U.S. at 19. Instead, "when the [U.S. Constitution's] Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Id. at 17. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's

'unqualified command.'"  Ibid. (quoting Konigsberg v. State Bar of Cal., 366 U.S. 36, 49 n.10 (1961)).

The Bruen Court asked three questions to resolve this inquiry:  (1) whether the petitioners were "part of 'the people' whom the Second Amendment protects"; (2) whether the weapons regulated by the challenged regulation were "'in common use'" for a lawful purpose; and (3) whether the Second Amendment protected the petitioners' "proposed course of conduct."  Id. at 31-32 (quoting District of Columbia v. Heller, 554 U.S. 570, 580, 625, 627 (2008) ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . . .")).

Defendant's challenge to N.J.S.A. 2C:39-9(e) appears to be a matter of first impression for this court.  However, our State's statute is analogous to 18 U.S.C. § 922(k), except for the requirement that the firearm be in the stream of interstate commerce.  Compare N.J.S.A. 2C:39-9(e) with 18 U.S.C. § 922(k).[10] Federal courts have repeatedly held that 18 U.S.C. § 922(k) remains constitutional post-Bruen.  See, e.g., United States v. Price, 111 F.4th 392, 397

---

[10]  Section 922(k) provides, in relevant part, that "[i]t shall be unlawful for any person knowingly . . . to possess . . . any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce."

A-1665-21

(4th Cir. 2024) ("We conclude that the conduct regulated by § 922(k) does not fall within the scope of the right enshrined in the Second Amendment because a firearm with a removed, obliterated, or altered serial number is not a weapon in common use for lawful purposes."); United States v. Serrano, 651 F. Supp. 3d 1192, 1210 (S.D. Cal. 2023) (finding that "the Second Amendment's plain text does not cover the conduct regulated by" § 922(k) because "[a] law requiring that firearms have serial numbers simply does not infringe [on] a law-abiding citizen's right to keep and bear arms for self-defense and other lawful purposes"); United States v. Avila, 672 F. Supp. 3d 1137, 1144 (D. Colo. 2023) (holding that "the kinds of firearms § 922(k) prohibits are not 'Arm[s]' within the meaning of the Second Amendment" (alteration in original)); United States v. Trujillo, 670 F. Supp. 3d 1235, 1241 (D.N.M.) (holding that "the conduct proscribed by § 922(k) is not protected by the text of the Second Amendment because the type of firearms prohibited by § 922(k) are not those typically possessed by law-abiding citizens for lawful purposes"), appeal dismissed, 2023 WL 5093358 (10th Cir. 2023); United States v. Holton, 639 F. Supp. 3d 704, 708 (N.D. Tex. 2022) (holding that § 922(k) "pass[es] constitutional muster under the Bruen framework").

The same holds true for N.J.S.A. 2C:39-9(e), our State's counterpart to 18 U.S.C. § 922(k). Because it is hard to conceive of any common-sense reason why a law-abiding citizen would want to use a firearm with an obliterated or defaced serial number and there is no evidence in the record that defaced firearms are nonetheless commonly lawfully used, we conclude that firearms with defaced serial numbers are not in common use for a lawful purpose and therefore fall outside the scope of the Second Amendment's protection. "[T]he presence of a serial number does not impair the use or functioning of a weapon in any way, . . . and a person is just as capable of defending [oneself] with a marked firearm as with an unmarked firearm." United States v. Marzzarella, 614 F.3d 85, 94 (3d Cir. 2010), abrogated on other grounds by Bruen, 597 U.S. 1. Thus, N.J.S.A. 2C:39-9(e) does not violate the Second Amendment.

VI.

In Point V, defendant challenges the use of STRmix, the "software used for analyzing DNA . . . in this case," claiming it was improperly admitted without first conducting a Frye hearing. Defendant asserts that because "STRmix has never been found reliable or admissible in New Jersey," the case should be remanded "for a testimonial Frye hearing." Because defendant raises

this issue for the first time on appeal, we again review for plain error. R. 2:10-2; Clark, 251 N.J. at 286-87.

STRmix is a version of probabilistic genotyping software that "is designed to address intricate interpretational challenges of testing low levels or complex mixtures of DNA." State v. Pickett, 466 N.J. Super. 270, 277 (App. Div. 2021). It "utilizes and implements an elaborate mathematical model to estimate the statistical probability that a particular individual's DNA is consistent with data from a given sample, as compared with genetic material from another, unrelated individual from the broader relevant population." Ibid. "The software in the end helps to measure the probability that a mixture of DNA includes a given individual's DNA." United States v. Gissantaner, 990 F.3d 457, 461 (6th Cir. 2021). For that reason, "probabilistic genotyping software[] marks a profound shift in DNA forensics." Pickett, 466 N.J. Super. at 277.

Still, "DNA testing is an evolving science," State v. Harvey, 151 N.J. 117, 155 (1997), and DNA testing, by multiple methodologies, has been accepted by our courts for decades. See generally State v. Deloatch, 354 N.J. Super. 76 (Law Div. 2002) (discussing multiple DNA testing methodologies, including restriction fragment length polymorphism analysis, the amplification process known as polymerase chain reaction, the DQ Alpha Test, Polymarker Test, and

STR Testing). "The Frye test requires trial judges to determine whether the particular science underlying the proposed expert testimony has 'gained general acceptance in the particular field in which it belongs.'" Pickett, 466 N.J. Super. at 302 (quoting Frye, 293 F. at 1014).[11] Although STRmix remains relatively new to our courts, its admissibility and reliability have been tested by state and federal courts and withstood the rigors of a Frye hearing.[12]

In People v. Bullard-Daniel, 163 N.Y.S.3d 726, 728-29 (App. Div.), leave to appeal denied, 191 N.E.3d 396 (N.Y. 2022), a New York appeals court concluded that "the evidence introduced at the Frye hearing . . . established that the methods employed in the STRmix program were generally accepted as reliable within the relevant scientific community at the time the DNA evidence was analyzed." The hearing also elucidated "that the STRmix program had been the subject of numerous peer-reviewed journal articles and had been evaluated and approved by the National Institute of Standards and Technology." Id. at 728. In addition, the hearing revealed that "the STRmix program was being used

---

[11] When this case was tried, New Jersey courts "continued to rely on the Frye standard to assess reliability." State v. J.L.G., 234 N.J. 265, 280 (2018).

[12] Notwithstanding the parties' motion practice to supplement the record with a transcript of a 2018 Middlesex County trial court hearing on the admissibility of STRmix in an unrelated case, we decline to consider the transcript.

by numerous forensic testing agencies and laboratories in New York, California, the United States Army, Australia, and New Zealand." Ibid.

In Gissantaner, 990 F.3d at 460, 470, the Sixth Circuit reversed the district court, holding that it erred when it "excluded the STRmix evidence as unreliable." Addressing its general acceptance in the scientific community, the court pointed out that STRmix

> has garnered wide use in forensic laboratories across the country. More than [forty-five] laboratories use it, including the FBI and many state law enforcement agencies. At this point, STRmix is the "market leader in probabilistic genotyping software."
>
> Consistent with this reality, numerous courts have admitted STRmix over challenges to its general acceptance in the relevant scientific community.
>
> [Id. at 466 (citation omitted).]

The court added that STRmix has a "low error rate," "is testable and refutable[,]" and "more than [fifty] published peer-reviewed articles had addressed [it]." Id. at 464-66. The court therefore concluded "STRmix satisfies Rule 702 [of the Federal Rules of Evidence] and the case law construing it." Id. at 467.

Here, during the trial, defendant vigorously cross-examined Basile, the State's DNA expert who testified about STRmix in general and its application to this case in particular. However, defendant never objected to the foundation of

the expert's opinion or the reliability or general acceptance of STRmix. Neither did defendant request a Frye hearing. Given the acceptance of STRmix across the country by other state and federal courts and the absence of an objection by defense counsel on reliability grounds, we are satisfied that admitting the STRmix analysis and Basile's corresponding testimony did not rise to the level of plain error.

## VII.

In Point VI, defendant argues that his aggregate extended term thirteen-year sentence, with six-and-one-half years of parole ineligibility, was excessive.[13] He asserts the weight the judge accorded to aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), was improper and constituted "impermissible double counting."

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

---

[13] Defendant received an extended term of thirteen years in prison, with a six-and-one-half-year period of parole ineligibility, on the unlawful possession of a firearm charge; a concurrent eighteen-month sentence on the defaced firearm charge; and a concurrent five-year sentence, with a five-year period of parole ineligibility, on the certain persons charge.

affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Under New Jersey's penal code, "a sentencing court first must determine, pursuant to N.J.S.A. 2C:44-1(a) and (b), whether aggravating and mitigating factors apply. After balancing the factors, the trial court may impose a term within the permissible range for the offense." State v. Bieniek, 200 N.J. 601, 608 (2010). "[W]hen the aggravating factors preponderate, sentences will tend toward the higher end of the range." Case, 220 N.J. at 64-65 (quoting State v. Natale, 184 N.J. 458, 488 (2005)). "In their application of the N.J.S.A. 2C:44-1 factors, sentencing courts are cautioned to avoid 'double counting' circumstances that the Legislature has already incorporated as an element of the offense." State v. Lawless, 214 N.J. 594, 608 (2013).

Here, after granting the State's application, the judge determined defendant was eligible for sentencing under the persistent offender statute, N.J.S.A. 2C:44-3(a). In imposing sentence, the judge found aggravating factors three, six, and nine based on the high risk of re-offense, the extent of defendant's

prior criminal history, and the need for deterrence, respectively.  See N.J.S.A. 2C:44-1(a)(3), (6), (9).  The judge found no mitigating factors and determined that "the aggravating factors clearly and substantially outweigh[ed] the non-existent mitigating factors."  We discern no abuse of discretion in the judge's sentencing decision, which comports with the sentencing guidelines, is amply supported by credible evidence in the record, and does not shock the judicial conscience.

Defendant argues the judge "double counted when weighing aggravating factor [nine]."  We disagree.  Aggravating factor nine requires a sentencing court to consider "[t]he need for deterring the defendant and others from violating the law."  N.J.S.A. 2C:44-1(a)(9).  In that regard, the judge expounded:

> There[ is] an overwhelming need to deter . . . defendant and others from unlawfully possessing handguns. There[ is] no allegation of course here that . . . defendant used the weapon that was found secreted in the trunk of his car during the commission of a separate crime but I think most people would agree that guns do cause serious injury and certainly guns cause death.
>
> New Jersey has strong gun laws for a reason, to deter people [from] the unlawful possession of handguns and to protect its citizens.  So [a]ggravating [f]actor [number nine] is a very substantial one to the [c]ourt.

"'Deterrence has been repeatedly identified in all facets of the criminal justice system as one of the most important factors in sentencing,' and 'is the key to the proper understanding of protecting the public.'" Fuentes, 217 N.J. at 78-79 (quoting State v. Megargel, 143 N.J. 484, 501 (1996)). "For purposes of N.J.S.A. 2C:44-1(a)(9), deterrence incorporates two 'interrelated but distinguishable concepts,' the sentence's 'general deterrent effect on the public [and] its personal deterrent effect on the defendant.'" Id. at 79 (alteration in original) (quoting State v. Jarbath, 114 N.J. 394, 405 (1989)). "The need for public safety and deterrence increase proportionally with the degree of the offense." State v. Carey, 168 N.J. 413, 426 (2001) (citing Megargel, 143 N.J. at 500).

Here, the judge commented that these were defendant's eleventh and twelfth indictable convictions, noting that defendant had "multiple" drug-related convictions, "including convictions for possessing drugs with the intent to distribute same within 1,000 feet of school property, posing a danger to the community, and more importantly, to those attending school." The record supports the judge's determination that deterrence was a substantial factor based on New Jersey's strict gun control laws as well as defendant's extensive criminal history, the nature and type of offenses in that troubling history, "and the fact

that prison ha[d] not <u>deterred</u> further [criminal] conduct" by defendant.[14] (Emphasis added).

## VIII.

Finally, in his supplemental brief, defendant argues the extended term imposed pursuant to N.J.S.A. 2C:44-3(a) on count four (unlawful possession of a firearm) must be vacated given our recent decision in <u>State v. Carlton</u>, 480 N.J. Super. 311 (App. Div. 2024). We reject defendant's argument.

<u>Carlton</u> comes on the heels of <u>Erlinger v. United States</u>, in which the United States Supreme Court held that "the Fifth and Sixth Amendments generally guarantee a defendant the right to have a unanimous jury find beyond a reasonable doubt any fact that increases his [or her] exposure to punishment." 602 U.S. 821, 828, 833-34 (2024). The Supreme Court further stated that "[v]irtually 'any fact' that '"increase[s] the prescribed range of penalties to which

---

[14] The judge also recounted defendant's juvenile history consisting of adjudications for criminal mischief, possession of CDS, possession of CDS with intent to distribute, and violation of probation. As an adult, in addition to municipal court convictions, defendant was convicted four times of possession of CDS with intent to distribute within 1,000 feet of school property, twice for possession of CDS with intent to distribute, escape, certain persons, possession of CDS, possession of a prohibited weapon, possession of a synthetic drug, and forgery. The judge pointed out that over the years, defendant has served several prison sentences, has "violated probation as a juvenile," and has violated "parole as an adult."

a criminal defendant is exposed"' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." Id. at 834 (second alteration in original) (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)).

Under N.J.S.A. 2C:44-3(a), upon application of the prosecuting attorney, a person may be sentenced to an extended term of imprisonment if the individual "has been convicted of a crime of the first, second or third degree and is a persistent offender." The statute defines a "persistent offender" as:

> [A] person who at the time of the commission of the crime is [twenty-one] years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he [or she] was at least [eighteen] years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within [ten] years of the date of the crime for which the defendant is being sentenced.
>
> [Ibid.]

In Carlton, we acknowledged that Erlinger abrogates the rule that had allowed a sentencing court to determine the factual predicates for eligibility for enhanced sentencing under the persistent offender statute. 480 N.J. Super. at 326. We held that "a unanimous jury must find beyond a reasonable doubt that all five of the above-enumerated factual predicates are present, or the defendant

42

must admit these predicates as part of a knowing and voluntary waiver of the right to a jury trial with respect to extended-term eligibility." Id. at 328-29. We noted that

> the parties may enter into a negotiated post-conviction agreement to avoid the need to convene a jury to decide whether defendant is eligible for an extended term as a persistent offender. If any such post-conviction agreement contemplates that defendant may be sentenced to an extended term as a persistent offender, the defendant must admit to the facts establishing persistent-offender eligibility in a manner consistent with the entry of a knowing and voluntary guilty plea pursuant to Rule 3:9-2, including the requirement for the defendant to acknowledge the "factual basis" for the plea.
>
> [Id. at 356.]

Here, post-conviction, defendant waived his right to a jury trial and pleaded guilty to second-degree certain persons not to possess a firearm. In his plea allocution, defendant admitted that he had two prior convictions for offenses that took place on at least two separate occasions when he was at least eighteen years old, that he was at least twenty-one years old when he committed the present offense, and that his most recent crime or release from confinement was within ten years of the present offense. See N.J.S.A. 2C:44-3(a); Carlton, 480 N.J. Super. at 327-28. We are satisfied that defendant "freely admitted in

[his] guilty plea" the relevant facts rendering him eligible for an extended term sentence. <u>Erlinger</u>, 602 U.S. at 834.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division