# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3520-24

STATE OF NEW JERSEY,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

LATIMAR BYRDSELL,[1]

      Defendant-Respondent/
      Cross-Appellant.

_____

      Submitted March 11, 2026 – Decided April 15, 2026

      Before Judges Currier, Berdote Byrne, and Jablonski.

      On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 07-02-0162.

      Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for appellant/cross-respondent (Stephen C. Sayer, Assistant Prosecutor, of counsel and on the briefs).

---

[1] Defendant's first name, misspelled as "Latimer," in previous captions is correctly spelled "Latimar." We use the correct spelling within the opinion.

Jennifer N. Sellitti, Public Defender, attorney for respondent/cross-appellant (Andrew Burroughs, Designated Counsel, on the briefs).

PER CURIAM

The State of New Jersey appeals from an interlocutory order granting defendant Latimar Byrdsell's petition for post-conviction relief (PCR), vacating his conviction for felony murder, and ordering a new trial. Byrdsell's conviction stems from the July 10, 2006 death of A.D., the three-and-one-half-year-old daughter of his fiancée.

Following an evidentiary hearing, the PCR court considered newly conducted DNA testing performed by Byrdsell's expert, which reported partial male DNA profiles in samples retrieved from the victim that excluded Byrdsell and identified an unknown male contributor. In his PCR petition, Byrdsell raised a claim of ineffective assistance of counsel for his attorneys' failure to retain a DNA expert at trial. Although the PCR court expressed reservations regarding whether the performance prong of Strickland v. Washington, 466 U.S. 668 (1984) had been met, it granted PCR, finding the prejudice prong satisfied and allowing the conviction to stand would constitute a fundamental injustice pursuant to State v. Hannah, 248 N.J. 148 (2021).

2

On appeal, the State challenges the PCR court's authority to grant relief in the absence of a finding of ineffective assistance of counsel, and argues the court misapplied principles of fundamental fairness discussed in Hannah. Byrdsell cross-appeals, contending the PCR court erred in declining to find trial counsel constitutionally ineffective for failing to seek DNA testing of samples retrieved from the victim.

After careful review, we affirm the grant of PCR, on grounds different from those relied upon by the PCR court.[2] Although Hannah does not support the PCR court's decision, we are satisfied trial counsel's failure to seek available DNA testing constituted ineffective assistance of counsel pursuant to Strickland because there was a reasonable probability the testing results might have changed the outcome of trial.

I.

The detailed facts of this case are set forth at length in our opinion addressing Byrdsell's direct appeal, which we incorporate by reference. State v. Byrdsell, A-5356-13 (App. Div. Dec. 1, 2017). We highlight only the facts relevant to this appeal.

---

[2] An order will be affirmed on appeal if it is correct, even if we do not adopt the specific reasoning of the trial judge. State v. McLaughlin, 205 N.J. 185, 195 (2011).

A-3520-24

On July 10, 2006, Byrdsell was with his fiancée's three-and-one half-year-old daughter, A.D., at their motel-apartment from approximately 1:45 p.m., when her mother left for work, until EMTs arrived that evening in response to 911 calls Byrdsell had placed at 9:38 and 9:43 p.m. The child's mother had directed Byrdsell to call 911 because she had called him from work and he told her the child was gasping for air.

A.D.'s pulse was weak when EMTs arrived and became undetectable en route to the hospital. She was pronounced dead at 10:38 p.m. The emergency room physician examining A.D.'s body observed injuries to her vaginal and anal areas, prompting notification to law enforcement. The next afternoon Detectives O'Neill and Roman of the Cumberland County Prosecutor's Office (CCPO) interviewed the child's mother. Byrdsell arrived during the interview and agreed to accompany the detectives to the police station and give a statement.

The interview commenced at 4:00 p.m. After receiving and waiving his Miranda[3] rights, Byrdsell answered questions about his living arrangements, his relationship with A.D., and the events of July 10. During the recorded portions of the interrogation, Byrdsell maintained his innocence. He also stated he left A.D. in the motel-apartment at approximately 8:00 p.m. on July 10 to get

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3520-24

cigarettes and left the door unlocked. At 8:58 p.m. on the night of the interrogation, Byrdsell requested the recording device be turned off. No recordings were made thereafter. Byrdsell subsequently signed a typed summary prepared by the detectives at 11:53 p.m., nearly eight hours after the interview began.

The statement, which was read to defendant before he signed it and to the jury at trial, includes the following: Byrdsell started drinking brandy between 3:00 and 4:00 in the afternoon on July 10. Around 8:30, A.D. started acting up, and he told her to be quiet. He stated he picked A.D. up from her bed, laid her on the other bed on her stomach and put a pillow over her head. When she moved and tried to take the pillow off, he pushed it down. After she was quiet, he removed the pillow and noticed she was not breathing normally. The statement also read: "The injuries that [A.D.] has in her vagina and anus were caused when I had her head covered with the pillow. I did not put any object or anything inside of her. I didn't touch her vagina or anus."

Following an autopsy, the medical examiner, Dr. Blanchard, concluded the child died as a consequence of asphyxia due to smothering. She found internal and external bruising of the child's neck and back. Among other injuries, Dr. Blanchard found a one-half inch long rectal tear caused by a

5

"forceful stretching," an abraded bruise inside the child's labia minora, and hymen that was not intact, "very red" and had a "scrape." Dr. Blanchard concluded those injuries were sustained no earlier than twenty-four hours before the child's death.

The evidence revealed the child was with relatives at her grandmother's house the day before she died and had returned to the apartment with her mother and defendant at approximately 11:00 p.m. That was approximately twenty-three hours and thirty-eight minutes before she was pronounced dead. There were no eyewitnesses to any offenses.

A Cumberland County Grand Jury returned an indictment, charging Byrdsell with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one), first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count two), first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a) (count three), and two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b) and (c) (counts four and five).

A jury trial was conducted in April and May 2013. The jury found Byrdsell guilty of the lesser-included offense of aggravated manslaughter, N.J.S.A. 2C:11-4(a) (amended count one), felony murder (count two), and aggravated sexual assault (count three). The court merged Byrdsell's

convictions for felony murder and first-degree aggravated sexual assault but not his convictions for felony murder and aggravated manslaughter. Count five was dismissed at trial, and the verdict sheet directed the jury not to consider count four if it found Byrdsell guilty of aggravated sexual assault.

On November 15, 2013, Byrdsell was sentenced to life imprisonment without the possibility of parole for felony murder, and a concurrent twenty-seven-year term, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, for aggravated manslaughter. Count three was merged with the felony murder conviction.

Byrdsell appealed. On December 1, 2017, we affirmed his convictions but remanded for entry of a corrected judgment of conviction and resentencing to merge the aggravated manslaughter conviction into the felony murder conviction, vacate the aggravated manslaughter conviction, and dismiss count four.

On May 29, 2018, Byrdsell filed a pro se petition for PCR, alleging claims of ineffective assistance of trial counsel. On May 31, 2022,[4] Byrdsell moved for post-conviction DNA testing of vaginal and anal samples that had been

[4] There is no explanation in the record for the four-year gap between the filing of the PCR petition and the filing of the brief in support of DNA testing.

A-3520-24

collected from the victim pursuant to N.J.S.A. 2A:84A-32(a), which was granted. Laboratory testing conducted by the New Jersey State Police Office of Forensic Sciences (OSF) found no DNA in the tested vaginal and anal specimens. PCR counsel subsequently moved for additional DNA testing of the remaining samples by Byrdsell's DNA expert using a "different chemistry" than was used by OSF, which the court granted.

Byrdsell's expert, Katherine Cross, analyzed the retained vaginal and anal swabs using a more sensitive Y-chromosome Short Tandem Repeat (Y-STR) testing method and reported detection of two partial unknown Y-STR DNA profiles in the vaginal and anal swabs, both inconsistent with Byrdsell. The Cross report concluded Byrdsell was excluded as the potential source of the partial Y-STR profiles observed in the samples. The report further identified an unknown male as the source of the partial Y-STR profiles.

On January 24, 2024, Byrdsell submitted a supplemental brief in support of his PCR petition, asserting:

> 1) ineffective assistance of trial counsel for counsel's failure to retain a DNA expert at trial; 2) newly discovered evidence based on a 2022 Pathology Report by Dr. Jack Daniel; 3) ineffective assistance of trial counsel for counsel's failure to retain an expert during the trial court's <u>Miranda</u> hearing; 4) ineffective assistance of trial counsel for committing multiple errors that cumulatively resulted in depriving Petitioner

8

of effective assistance of counsel and his right to a fair trial; and 5) prima facie evidence of ineffective assistance of counsel at least entitled Petitioner to an evidentiary hearing.

On July 18, 2024, the PCR court heard oral argument and granted an evidentiary hearing, limited to Byrdsell's claim of ineffective assistance of trial counsel for failing to retain a DNA expert, and denying petitioner's remaining claims on the record. The evidentiary hearing took place on January 23 and April 30, 2025. The court heard testimony from Katherine Cross, the State's DNA expert Theresa Nezezon, and Byrdsell's lead and secondary trial counsel.

On May 30, 2025, the court issued a written opinion granting Byrdsell PCR, vacating his felony murder conviction, and ordering a new trial. As to its Strickland analysis, the court reasoned:

> While the [c]ourt finds trial counsel was not so egregiously ineffective, this [c]ourt feels under these unique circumstances, that this [c]ourt's analysis should not end with a strict interpretation of the first Strickland factor because it is clear to this [c]ourt, that the second prong of the Strickland test is met[.] . . .

The court also concluded, even if the Strickland test was not met, it would be a manifest injustice for the conviction to stand pursuant to Hannah:

> While this [c]ourt is not confident, based on trial counsel's testimony that the Petitioner has satisfied the Strickland factors in the context of trial counsel's handling of the DNA evidence at the time of trial, the

9

procedural history of this case, specifically, the Petitioner's current convictions have been altered, inconsistent with the evidence and theories, creating a fundamental injustice consistent with Hannah, thus warranting a new trial.

The State moved for leave to appeal. Byrdsell timely filed a cross-appeal, challenging the PCR court's finding that trial counsel was not constitutionally ineffective. We granted leave to appeal.

II.

In State v. Hernandez-Peralta, our Supreme Court recently reaffirmed our role in reviewing PCR petitions: "Our review of a PCR court's factual findings is 'necessarily deferential.' However, we review a PCR court's legal conclusions de novo." 261 N.J. 231, 246 (2025) (citation omitted) (quoting State v. Nash, 212 N.J. 518, 540 (2013)).

We preface our analysis by acknowledging the well-known legal principles governing PCR appeals. PCR is analogous to the federal writ of habeas corpus. State v. Pierre, 223 N.J. 560, 576 (2015). Both the Sixth Amendment of the United States Constitution and Article 1, Paragraph 10 of the State Constitution guarantee the right to effective assistance of counsel at all stages. See Strickland, 466 U.S. at 686-87; State v. Fritz, 105 N.J. 42, 58 (1987). In addressing an ineffective assistance of counsel claim raised in a petition for

PCR, New Jersey courts follow the two-part test articulated in Strickland, 466 U.S. at 687.  See Fritz, 105 N.J. at 58.  "First, the defendant must show that counsel's performance was deficient."  State v. Gideon, 244 N.J. 538, 550 (2021) (quoting Strickland, 466 U.S. at 687).  "Second, the defendant must have been prejudiced by counsel's deficient performance."  Ibid. (citing Strickland, 466 U.S. at 687).

To meet the first prong of the Strickland/Fritz test, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.  Reviewing courts provide "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."  Id. at 689.  However, a defendant may rebut the presumption of effectiveness by proving trial counsel's actions were not "sound trial strategy."  State v. Arthur, 184 N.J. 307, 319 (2005) (quoting Strickland, 466 U.S. at 689).  Defense counsel's failure to conduct an adequate pre-trial investigation may give rise to an ineffective assistance of counsel claim.  State v. Porter, 216 N.J. 343, 350, 357 (2013).  For example, "[e]vidence clearly capable of altering the outcome of a verdict that could have been discovered by reasonable diligence at the time

of trial would almost certainly point to ineffective assistance of counsel." Nash, 212 N.J. at 550 (quoting State v. Ways, 180 N.J. 171, 192 (2004)).

At the evidentiary hearing, Byrdsell's trial attorneys testified they declined to conduct DNA testing out of concern that unfavorable results would be disclosed to the State, an error in their understanding of the law. This decision cannot be categorized as sound trial strategy because if the DNA testing had yielded unfavorable results, counsel had no obligation to disclose the results unless they intended to use the results at trial. See R. 3:13-3(d) ("This rule does not require discovery of a party's work product consisting of internal reports, memoranda or documents made by that party or the party's attorney or agents, in connection with the investigation, prosecution or defense of the matter."); see also State v. Knight, 256 N.J. 404, 419 (2024) ("[D]efense counsel cannot be compelled, via discovery, to give the State inculpatory expert materials it generated in preparation for trial unless the defense intends to introduce or use that expert evidence at trial." (citing State v. Mingo, 77 N.J. 576, 582 (1978))). Counsel's decision to forego DNA testing was rooted in an erroneous interpretation of law regarding its discovery obligations and therefore cannot constitute effective performance. See State v. Fisher, 156 N.J. 494, 507 (1998) (finding that if counsel's decision was "based on her erroneous interpretation of

the law," her performance was deficient under <u>Strickland</u>). Contrary to the State's arguments, other than cost, which Byrdsell's secondary counsel testified was not part of their decision, there was no risk in the defense obtaining DNA analysis. Had the results inculpated Byrdsell, the defense would not have been obligated to use them at trial, and therefore would not have been obligated to disclose them to the State.

Beyond counsels' misunderstanding of their discovery obligations, lead counsel's testimony at the evidentiary hearing underscores the uninformed nature of the decision to forgo DNA testing. Although lead counsel initially testified she and secondary counsel consulted with two experts prior to trial, she later admitted she never consulted with a DNA expert for Byrdsell's case, and to her knowledge, neither did secondary counsel. Moreover, lead counsel testified she did not recall ever discussing with secondary counsel the risks associated with pursuing DNA testing.

When asked whether she knew what Y-STR DNA testing was at the time of Byrdsell's trial, lead counsel was unsure, stating "[i]t is really hard to know, when you do this kind of work[,] at what point you go from not knowing something to knowing it." Similarly, Byrdsell's secondary trial counsel testified he had "probably" heard of Y-STR DNA testing prior to trial but could not say

13

he knew "everything about it" at the time, and he would have "studied up" on it if it became part of the case. Both attorneys also testified they had not received any training in DNA analysis at the time of trial.

Because Byrdsell's trial attorneys were uncertain whether they were even aware of Y-STR testing prior to trial, it strains credulity to conclude they possessed the knowledge necessary to make a sound strategic decision regarding testing the samples. The decision whether to pursue DNA testing is of particular significance in a sexual assault case where the defense had proffered third-party guilt, particularly with respect to the sexual claims. The record does not support a finding counsel made an informed decision to forgo DNA testing where their familiarity with the available methodology was, at best, uncertain.

Of course, counsel's conduct must be evaluated from the perspective of the time of their decision, without the benefit of hindsight. See Fisher, 156 N.J. at 500. Trial counsel explained their decision not to test the samples by asserting DNA testing was not common at the time of Byrdsell's trial. However, that assertion is strikingly anachronistic for a case tried in 2013. New Jersey courts have recognized the reliability and routine use of DNA testing since the 1990s. See State v. Marcus, 294 N.J. Super. 267 (App. Div. 1996); State v. Harvey, 151 N.J. 117 (1997); State v. Dishon, 297 N.J. Super. 254 (App. Div. 1997). By

14

1994, the Legislature mandated the submission of a DNA sample from every person convicted of aggravated sexual assault or sexual assault. N.J.S.A. 53:1-20.20(g). By 2002, our courts recognized that short tandem repeat testing had "become the most commonly accepted means of DNA testing in the scientific community," noting its use by forty-eight states and the FBI and its routine application nationwide. State v. Deloatch, 354 N.J. Super. 76, 86 (Law Div. 2002).

As to Y-STR testing specifically, the State's expert in DNA analysis, Theresa Nezezon, testified OSF has been conducting Y-STR testing since 2006. Cf. State v. Fortin, 464 N.J. Super. 193, 205 (App. Div. 2020) (demonstrating that by 2005, the "more powerful and sophisticated" Y-STR testing method was being employed in New Jersey criminal prosecutions); State v. Calleia, 414 N.J. Super. 125, 148 (App. Div. 2010), rev'd on other grounds, 206 N.J. 274 (2011) (noting expert testimony that "Y-STR DNA analysis is a 'non-experimental, demonstrable technique' that is widely accepted by forensic scientists"). Nezezon also testified the PowerPlex Y23 kit, which Cross used for amplification, was available in 2012, confirming the very kit used to produce these results existed and was accessible to counsel before Byrdsell's trial.

Viewed in totality, the record supports the conclusion counsel's decision to forgo DNA testing was neither sufficiently informed nor the product of sound legal strategy. The first prong of Strickland is satisfied.

The second Strickland prong requires the defendant to show counsel's errors created a "reasonable probability" that the outcome of the proceeding would have been different if counsel had not made the errors. Strickland, 466 U.S. at 694. This "is an exacting standard." Gideon, 244 N.J. at 551 (quoting State v. Allegro, 193 N.J. 352, 367 (2008)). Prejudice is not presumed but must instead be affirmatively proven by the defendant. Ibid. (quoting Strickland, 466 U.S. at 693). The relative strength of the State's case at trial bears directly on this inquiry, as "a conviction is more readily attributable to deficiencies in defense counsel's performance when the State has a relatively weak case than when the State has presented overwhelming evidence of guilt." Id. at 557; see also Pierre, 223 N.J. at 583 ("Important to the prejudice analysis is the strength of the evidence that was before the fact-finder at trial. '[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" (quoting Strickland, 466 U.S. at 696)).

A-3520-24

Applying those principles here, we are satisfied Byrdsell has met his burden under the second prong. He has demonstrated, to a degree of reasonable probability, that but for counsel's deficiencies, the outcome of the trial may have been different.

We begin the prejudice assessment by examining the overall strength of the evidence presented against Byrdsell. The State's case rested primarily on Byrdsell's statements to law enforcement. Notably, Byrdsell never confessed to the sexual assault. Significant portions of the interrogation were not recorded. During the recorded portions, Byrdsell maintained his innocence. The incriminating admissions upon which the State relied appeared only in a written statement Byrdsell signed after the recording had been stopped. In the statement, Byrdsell said: "The injuries that [A.D.] has in her vagina and anus were caused when I had her head covered with the pillow." Byrdsell never admitted to sexual assault in the written statement. There were no eyewitnesses to the offenses. The rape kit was never subjected to DNA testing prior to trial, and no physical or forensic evidence directly linking Byrdsell to the sexual assault of A.D. was presented to the jury.

Against this evidentiary backdrop, we consider the possible effect of the DNA analysis conducted by Byrdsell's expert, Cross, which was not presented

17

to the jury at trial. Cross's Y-STR testing of the retained vaginal and anal swabs produced two partial male DNA profiles, neither of which was consistent with Byrdsell. Cross testified both samples contained a thirteen allele, which could not have been contributed by Byrdsell, who carries a ten allele. The results also established the presence of an unknown male's DNA in the samples. As noted, defense counsel's strategy at trial was that someone else was responsible for A.D.'s sexual assault and death. The DNA evidence identified by Cross would have provided the alternative third-party guilt defense with physical corroboration the defense otherwise lacked. A jury presented with exclusionary DNA evidence may have had a concrete forensic basis to entertain reasonable doubt as to whether Byrdsell committed the crimes.

We next consider Byrdsell's aggravated manslaughter conviction, which was merged into the felony murder conviction. The PCR court found Cross's DNA results, while bearing on Byrdsell's sexual assault conviction, had no relevance to A.D.'s death.[5] We disagree. Although Dr. Blanchard testified the

---

[5] Despite this conclusion, the PCR court granted a new trial as to the felony murder conviction. However, the PCR court could have left the aggravated manslaughter conviction undisturbed. Merger does not extinguish the underlying convictions; it merely consolidates them for sentencing purposes. State v. Pennington, 273 N.J. Super. 289, 295 (App. Div. 1994). If a conviction for a greater offense is vacated, the trial court may "unmerge" the lesser offense

sexual assault and the victim's death were two distinct acts, the State consistently portrayed them as inseparable at trial, urging the jury that the same person who committed one necessarily committed the other and the sexual assault was the motive for the killing. Indeed, the State argued in closing statements:

> In this instance, when you hear about a sexual assault of a child, I would expect that the first thing that you're going to expect, if there's a death connected, is that the sexual assault is connected to the death.
> That they're not two completely separate, random acts that just happened to coincidentally occur and I would suggest to you that that is what the case is here.

The State later contended:

> The statement of Mr. Byrdsell regarding [the victim's] condition[] should prove to you right then and there beyond a reasonable doubt that it was Mr. Byrdsell that committed the sexual assault.
> Now, that brings us to move on to the second aspect of this case, the death. Like I said, I would ask you to think about in your life experience, using common logic; well, what necessarily would the sex assault have to do with a death?
> Common sense, life experience tells you that it could occur during the sexual assault. That it could be a motive, the sexual assault being the motive to kill the witness, the child, or it could be something that occurred that is just simply a byproduct of the action of the sexual assault.

---

and impose a sentence on that conviction, provided the grounds for reversal of the greater offense do not affect the validity of the lesser offense. Ibid.

Here, the State did not prosecute sexual assault and separately prosecute murder; it wove them together into a single narrative, arguing the aggravated sexual assault was the motive for, or the very mechanism of, A.D.'s death. A jury so instructed cannot be said to have reached its aggravated manslaughter verdict independently of its aggravated sexual assault verdict. To grant a new trial on the aggravated sexual assault while leaving the aggravated manslaughter conviction undisturbed would be to afford Byrdsell a remedy not reaching the full extent of the prejudice, because the jury who convicted Byrdsell of A.D.'s death was the same jury that was told, in the same breath, the aggravated sexual assault caused it.

In light of the foregoing, our Supreme Court's holding in <u>Nash</u> is particularly germane:

> "[E]vidence clearly capable of altering the outcome of a verdict that could have been discovered by reasonable diligence at the time of trial would almost certainly point to ineffective assistance of counsel." It hardly bears mentioning that "[w]e would not require a person who is probably innocent to languish in prison because the exculpatory evidence was discoverable and overlooked by a less than reasonably diligent attorney."
>
> [212 N.J. at 550.]

For the reasons stated, we conclude defendant met both <u>Strickland</u> prongs, warranting a new trial.

20

Although we conclude counsel rendered constitutionally ineffective assistance, we address briefly the State's contention that the PCR court misapplied Hannah by treating fundamental injustice as an independent basis for relief.

Rule 3:22-2 recognizes five cognizable grounds for PCR, including a "[s]ubstantial denial in the conviction proceedings of [a] defendant's [constitutional] rights," which encompasses the right to the effective assistance of counsel at issue in this appeal. See Nash, 212 N.J. at 541-42. The State argues the court lacked authority to grant PCR absent a cognizable ground enumerated in Rule 3:22-2, emphasizing the court "appears to have explicitly found that the defendant [did not meet the first prong of] Strickland."

In Hannah, the defendant was convicted of two counts of felony murder following a trial that largely turned on the testimony of a co-defendant, the prosecution's key witness, who testified he and Hannah had shot and killed two individuals. 248 N.J. at 155. In his PCR petition, Hannah argued the jury had not heard the full story as a result of trial counsel's failure to present two pieces of evidence implicating another individual, Thomas, as the killer. Id. at 162-63. The evidence not heard by the jury included a written investigative report,

stating "investigators found in the pocket of one of the victims a bloody piece of paper bearing a pager number and that when investigators called that number, Thomas responded." Id. at 155. Additionally, the jury did not hear testimony from Thomas's mother that "her son made various statements inferentially implicating himself in the murders, he plotted to frame Hannah, he split drug money with [Hannah's co-defendant], and he apparently came into possession of the heroin taken from the dead drug dealers." Ibid.

The central issue was whether the defendant was denied a fair trial because critical evidence supporting his third-party-guilt defense never reached the jury due to ineffective assistance of counsel. Id. at 155. However, before the Court could reach that issue, it first had to determine whether defendant's PCR claims were procedurally barred. Indeed, the defendant's PCR claims came before the Court after a "fourteen-year odyssey" through the PCR process and twenty-seven years after his conviction. Id. at 155, 175. Despite the lengthy delay, the Court reviewed the defendant's arguments on the merits, noting "[t]he tortuous post-conviction procedural path of th[e] case . . . included a series of hearings conducted by multiple judges, a raft of appeals, and a number of missteps and errors—all combin[ing] to delay a final adjudication of the issues within a reasonable timeframe." Ibid. In doing so the Court held:

> Our jurisprudence makes clear that our Rules of Court governing post-conviction relief petitions and proceedings do not render our courts "powerless to correct a fundamental injustice." Although a defendant is "generally barred from presenting a claim on PCR that could have been raised at trial or on direct appeal, R. 3:22-4(a), or that has been previously litigated, R. 3:22-5," those rules do not "require[ ] this Court to acquiesce to a miscarriage of justice."
>
> [Id. at 178 (quoting Nash, 212 N.J. at 546-47).]

The Court ultimately concluded Hannah "clearly established" both prongs under Strickland and the cumulative effect of trial counsel's errors, "combined with those made by the trial court and prosecutor," ultimately "deprived Hannah of his constitutional right to present a complete and credible third-party-guilt defense." Id. at 155, 190. If counsel had used the report, the Court found that the document, coupled with the defendant's testimony Thomas was the murderer, would have provided "the pathway toward the admission of Thomas's mother's testimony implicating her son." Id. at 182.

The PCR court's assessment of the present case, in which it did not find counsel constitutionally ineffective, does not meet the criteria addressed in Hannah. There, the Court found ineffective assistance of counsel and invoked the doctrine of fundamental fairness to relax procedural bars to reach PCR on the merits; it did not use fundamental fairness as an independent basis for relief

23

in the absence of finding a constitutional violation. The PCR court's reliance on <u>Hannah</u> was therefore misplaced. Notwithstanding, we disagree with its <u>Strickland</u> analysis and conclude counsel rendered constitutionally ineffective assistance by failing to pursue available DNA testing prior to Byrdsell's trial.

We affirm the order granting PCR and remand for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3520-24